E-FILED
Friday, 04 May, 2007  11:18:08 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JERAMIAH J. GRIFFIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO. 06-4051 |
| vs. | ) |
| | ) |
| OFFICER DOUG CORSARO, and OFFICER | ) |
| JIMMY MCVEY, JR., | ) |
| | ) |
| Defendants. | ) |

## RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

NOW COME the defendants, OFFICER DOUG CORSARO and OFFICER JIMMY McVEY, JR., by David A. Perkins of Heyl, Royster, Voelker & Allen, one of their attorneys, and pursuant to F.R.C.P. 56 respond to plaintiff's Motion for Summary Judgment and move for Summary Judgment in their favor, and in support thereof, state as follows:

I.     INTRODUCTION

On 6/21/05 Officer Douglas Corsaro initiated a car stop at approximately 2:35 a.m., in the Village of Monmouth, Illinois. Officer Corsaro stopped a 2000 Pontiac Grand Am which was operated by Jason Mettler. Jeramiah Griffin, the plaintiff in this matter, was a passenger in the Pontiac. Officer Corsaro was subsequently assisted by Officer McVey. Officers Corsaro and McVey arrested Jason Mettler and Jeramiah Griffin for various offenses, including possession of cannabis and methamphetamines. Jeramiah Griffin filed suit in this matter on 8/2/06. On or about 9/1/06 the Honorable Harold A. Baker, United States District Judge, issued an Order subsequent to a merit review, and concluded that plaintiff could pursue claims against Defendants Corsaro and McVey for alleged violations of Fourth Amendment rights during the 6/21/05 traffic stop.

HEYL ROYSTER
VOELKER
& ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

1

On 4/12/07 plaintiff, Jeramiah Griffin, filed a motion entitled "Motion of Plaintiff to Compel Production of Requested Discovery or, in the Alternative, Motion of Plaintiff for Summary Judgment in Plaintiff's Favor with Incorporated Memorandum of Law in Support".

## II.    EXHIBITS

Attached hereto and incorporated by reference herein are the following supporting exhibits:

Exhibit A    -    Deposition transcript of Jeramiah Griffin

Exhibit B    -    Deposition transcript of Jason Mettler

Exhibit C    -    Cooperation Plea Agreement and Stipulation of Facts

Exhibit D    -    Affidavit of Douglas Corsaro

Exhibit E    -    Affidavit of Jimmy McVey, Jr.

Exhibit F    -    Affidavit of Terry Hepner

Exhibit G    -    Deposition transcript of Trooper Jason Elswick

## III.    UNDISPUTED MATERIAL FACTS

**A.    Attached hereto as Exhibit A is the deposition transcript of the plaintiff, Jeramiah Griffin.  Mr. Griffin testified to the following undisputed facts:**

1.    He was arrested for residential burglary, aggravated battery, and unlawful possession of chemicals for the manufacturing of methamphetamine in 2002. (Ex. A, p. 6)

2.    The arrest in 2002 for burglary, aggravated battery, and unlawful possession of chemicals for the manufacturing of methamphetamine occurred in Warren County and then he had a probation violation in 1999 and went to boot camp. (Ex. A, p. 7)

3.    He was arrested for retail theft in 2001. (Ex. A, p. 7)

4.    On 6/21/05 he was arrested by Officer Corsaro and Officer McVey when he was in a Pontiac Grand Am that was owned by Tilliea Cooper. (Ex. A, p. 7)

5.    Jason Mettler was the driver of the Pontiac Grand Am and the vehicle was stopped on 6/21/05 at approximately 2:35 a.m. (Ex. A, p. 7)

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

2

6.  Griffin stated that Officer Corsaro stopped their vehicle and told Jason Mettler, the driver, that he was pulling them over because the registration light was not working. (Ex. A, p. 14-15)

7.  Griffin acknowledged that they were driving with the bright lights on because one headlight was not working if the lights were in the dim mode. (Ex. A, p. 15)

8.  Griffin admitted that he never got out of his vehicle to personally determine whether the registration light was out on the Pontiac Grand Am. (Ex. A, p. 9)

9.  Griffin admitted that he did not know whether the registration light was inoperable or not. (Ex. A, p. 9)

10. Griffin admitted that he owned the drugs in the vehicle and added that Mettler also would have owned the drugs in the vehicle. (Ex. A, p. 11)

11. Griffin admitted that the marijuana that was under the floor mat in the back seat was his. (Ex. A, p. 11-12)

12. Griffin admitted that there was 800 grams of methamphetamine in the trunk and that he and Jason Mettler put it in the trunk one to two hours prior to his arrest. (Ex. A, p. 13)

13. The 800 grams of methamphetamine were contained in a duffle bag and was hidden in a location out in the country and he and Mettler decided to pick it up that night prior to the car stop. (Ex. A, p. 13)

14. He admitted that he had $1,200 cash on him at the time of his arrest which he claimed was his. (Ex. A, p. 14)

15. The officers eventually told him that the dog "hit" on the car. (Ex. A, p. 18)

16. Griffin admitted that the canine dog "hit" on the car and that the canine dog jumped on their car. (Ex. A, p. 18)

17. Griffin admitted that he was instructed to get out of the vehicle and that he and Mettler refused. (Ex. A, p. 19)

18. Griffin admitted that after they were ordered to exit the vehicle Mettler turned the ignition to the car and Griffin then locked the doors. (Ex. A, p. 19)

19. Griffin admitted reading all of the police reports and he had previously reviewed the list of evidence seized from the vehicle and he did not deny that all the contraband and drugs that were seized were located in the vehicle. (Ex. A, p. 19)

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

20.     He signed a Plea Agreement when he was prosecuted by the federal government. (Ex. A, p. 22)

21.     Griffin examined the Cooperation Plea Agreement and Stipulation of Facts which was filed on 4/26/06 in Federal Court which was marked as Exhibit 1 to his deposition. (Ex. A, p. 22)

22.     With regard to the Cooperation Plea Agreement, Griffin admitted that he signed the document pleading guilty because he was in fact guilty. (Ex. A, p. 23)

23.     With regard to the Cooperation Plea Agreement and Stipulation of Facts, Griffin admitted that on 6/21/05 he and another individual endeavored to obtain methamphetamine which was to be distributed in Warren County. (Ex. A, p. 23)

24.     With regard to the Cooperation Plea Agreement, he indicated that during the early morning hours of 6/21/05 he had a bag in the automobile in which he was a passenger and that the bag had two jars of methamphetamine. (Ex. A, p. 23)

25.     Griffin admitted that he did not know what confidential information Officer Corsaro received before the 6/21/05 car stop. (Ex. A, p. 25)

26.     Griffin admitted that prior to 6/21/05 the Monmouth Police officers knew of his prior criminal history and his prior conviction for manufacturer of methamphetamine. (Ex. A, p. 25)

27.     Griffin acknowledged that there were a couple of jars of liquid methamphetamine in the vehicle. (Ex. A, p. 26-27)

28.     Griffin claimed that he was arrested a month before the car stop by Galesburg officers for possession of methamphetamine. (Ex. A, p. 27-28)

29.     Prior to the car stop on 6/21/05, Griffin admitted that Mettler had been arrested two or three years earlier for attempt to deliver drugs. (Ex. A, p. 28)

30.     Griffin acknowledged that at the time of the car stop he and Mettler both had been convicted of drug offenses. (Ex. A, p. 28)

31.     Griffin acknowledged that he hid the bag of methamphetamine out in the country two to three weeks before the car stop on 6/21/05. (Ex. A, p. 29)

32.     Griffin acknowledged that he manufactured the methamphetamine sometimes in houses and sometimes out in the open. (Ex. A, p. 29)

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

4

**B.    Attached hereto as Exhibit B is the deposition transcript of the Jason Mettler. Mr. Mettler testified to the following undisputed facts:**

1.    I was arrested for unlawful delivery of cannabis.  I pled guilty to that charge prior to June 2005. (Ex. B, p. 16)

2.    On 6/21/2005, the police stopped Jeramiah and myself in Monmouth, Illinois and arrested us.  (Ex. B, p. 5)

3.    At 2:35a.m. on June 21, 2005, Officer Douglas Corsaro pulled us over and came up to the vehicle.  Officer Corsaro told us he stopped us because a tail light or license plate light was not working. (Ex. B, p. 6)

4.    I do not know either way whether the registration light was out. (Ex. B, p. 13)

5.    When the red lights came on and pulled us over, I thought Griffin was worried about the weed he hand in his pocket.  When the lights came on, he took the bag of weed and shoved it underneath my seat. (Ex. B, p. 26)

6.    The officers said they had probable cause to search the car, and we told them we were not going to get out. (Ex. B, p. 10)

7.    When the officers told us to get out of the car, I started the car, but I did not move it. (Ex. B, p. 11)

8.    Before June 2005, Griffin had been involved in the manufacture of methamphetamines.  My position is that all these drugs found in the car belonged to Griffin, except for a little bit of marijuana I had in my sock.  The duffle bag in the car belonged to Jeramiah. (Ex. B, p. 17)

9.    The officers found cannabis in my sock. (Ex. B, p. 22)

10.    The wallet with no ID and over $1,200 in cash belonged to Griffin. Other than the cannabis in my sock, Griffin had some in his pocket.  He sold cannabis and methamphetamines at the time.  I did not know that there was a white powder or methamphetamines on the car's key chain. (Ex. B, p. 23)

11.    It was common knowledge on the streets before June 2005 that Griffin was manufacturing and selling methamphetamines.  Everyone knew it, including the cops. (Ex. B, p. 24)

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

5

C.    Attached hereto as Exhibit G is the deposition transcript of Trooper Jason Elswick.  Mr. Elswick testified to the following undisputed facts:

1.    I have been employed as an Illinois State Police Trooper for five years. (Ex. G, pg. 4)

2.    On Tuesday, 6/21/05 at approximately 2:35 a.m., I was called out to assist Officer Douglas Corsaro on a traffic stop that he had made near the 11th block of East Euclid Avenue in Monmouth, Illinois. (Ex. G, pg. 10-11)

3.    Officer Corsaro advised me that he had stopped the vehicle because the Pontiac rear registration plate light was not working. (Ex. G, pg. 13)

4.    Officer Corsaro said that both Griffin and Mettler had reached into the console area of the car, as well as into the back seat area of the car despite being told not to. (Ex. G, pg. 14)

5.    There was extensive intelligence indicating that both Griffin and Mettler were both involved in transporting illegal narcotics. (Ex. G, pg. 15)

6.    I believe that both Griffin and Mettler had arrest records for similar offenses, as well as, word of mouth from officer to officer. (Ex. G, pg. 15)

7.    I observed Mettler reach into the center console area of the Pontiac. (Ex. G, pg. 18)

8.    I observed Griffin reaching his hand  toward the floorboard of the back seat. (Ex. G, pg. 18)

9.    Mettler and Griffin repeatedly were reaching for things in the vehicle. (Ex. G, pg. 21)

10.    Mettler kept fiddling with a key chain or some sort of object. (Ex. G, pg. 21-22)

11.    Officer Corsaro, myself, and McVey, told Mettler and Griffin to quit moving, quit reaching. (Ex. G, pg. 22)

12.    During the search of the Pontiac, we found a large amount of cannabis in the rear seat area and the rear floorboard area. (Ex. G, pg. 34)

13.    The cannabis was behind the driver's seat and in the center of the seat, consistent with Griffin reaching into the back seat. (Ex. G, pg. 34)

14.    There were two glass jars in a gym type bag found in the trunk which contained a liquid substance that the officers believed was probably going to

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

be liquid meth or a liquid medium that had suspended methamphetamine in it. (Ex. G, pg. 36)

## IV.    ARGUMENT

### A.    Plaintiff's Claims Are Barred by the *Heck V. Humphrey*

Attached hereto as Exhibit C is a Cooperation Plea Agreement and Stipulation of Facts which was filed on or about 4/26/06 in the United States District Court for the Central District of Illinois, Rock Island Division. Exhibit C evidences that Jeramiah Griffin pled guilty to Count I of the indictment, namely, the conspiracy to possess with intent to distribute methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846. 21 U.S.C. § 841 provides:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally ----
>
> (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or
>
> (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

Plaintiff executed Exhibit C on or about 4/26/06. Contained within Exhibit C is a section entitled "Factual Basis". Exhibit C demonstrates that Jeramiah Griffin pled guilty to the offense because he was in fact guilty of Count I contained in the indictment. The factual basis section of Exhibit C further demonstrates that Jeramiah Griffin admitted that on or about 6/21/05 he and other individuals endeavored to obtain methamphetamines which were distributed in Warren County, Illinois. Moreover, Jeramiah Griffin admitted in Exhibit C to the following:

> As one example of such conduct, during the early morning hours of 6/21/05, the defendant [Jeramiah Griffin] had a bag in an automobile in which he was a passenger when the vehicle was stopped by an officer of the Monmouth Police Department. The bag had in it two jars containing about 878 grams of liquid by-product from the

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

clandestine manufacturing of methamphetamine. Despite being a by-product, the liquid contained some small amount of methamphetamine, as was subsequently determined by the Drug Enforcement and Administration Laboratory. Other items in the bag and the vehicle included equipment for the manufacturer of methamphetamine such as a hair dryer, assorted tools, coffee filters, a spatula, and an aquarium blower. In addition, small amounts of finished methamphetamine powder were located in the vehicle. The defendant [Jeramiah Griffin] had been involved in obtaining methamphetamine for distribution for approximately two years prior to his arrest on 6/21/05. The defendant knew that his conduct with methamphetamine as described above was against the law. See Exhibit C, pg. 15-16.

Exhibit C further demonstrates that plaintiff waived any right to appeal the conviction and further waived any right to collateral attack. See Exhibit C, pg. 5-6.

In *Heck v. Humphrey*, 512 US 477, 114 S.Ct. 2364, 129 L.Ed. 2d 384 (1994), the United States Supreme Court held that in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a Section 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a Federal Court's issuance of a writ of habeas corpus. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under 42 U.S.C. § 1983. Thus, when a state prisoner seeks damages in a Section 1983 suit, the District Court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the Complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

Before plaintiff can prosecute a § 1983 claim for an alleged unconstitutional detention or search of the vehicle in which he was a passenger, plaintiff must first demonstrate that his conviction or sentence has been reversed, expunged, or declared invalid. As outlined above, plaintiff waived any right to appeal and further waived any right to collateral attack. Therefore, pursuant to *Heck v.*

HEYL ROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

*Humphrey* plaintiff's claim is not cognizable under § 1983. Moreover, a judgment in a § 1983 claim for an alleged unconstitutional detention and search would necessarily imply the invalidity of his federal criminal conviction for knowingly or intentionally manufacturing, distributing, or possessing controlled substances which violates 21 U.S.C. § 841. Therefore, plaintiff's claim is not cognizable under § 1983.

> **B.    The Warren County State Court Order Dated 11/7/05 Finding That Certain Evidence Was Seized in Violation of the Fourth Amendment Does Not Have Collateral Estoppel Effect**

Attached to plaintiff's Motion for Summary Judgment and identified as Exhibit A is an opinion issued on 10/31/05 by the Honorable Greg McClintock, Associate Judge of the Ninth Judicial Circuit, Warren County, Illinois. The opinion letter outlines Judge McClintock's ruling on defendant's Motion to Suppress. Judge McClintock ruled that "Based on the totality of the circumstances, I cannot find that Officer Corsaro made a sufficiently specific suspicion that drugs or other contraband would be located in the Mettler vehicle at the time it was detained for the canine search. Therefore, I believe the State has failed to meet its burden and the Motion is granted". Judge McClintock subsequently signed a Court Order dated 11/7/05 (which is attached to plaintiff's Motion for Summary Judgment) which orders that "The State shall not be allowed to introduce at trial evidence observed or seized following the search of the vehicle in which defendant [Jeramiah Griffin] was located prior to his arrest for the charges described in the information herein. The arrest of the defendant is quashed."

Plaintiff, in his Motion for Summary Judgment, attempts to collaterally estop the defendants from re-litigating the issue of probable cause for the search of the vehicle. Plaintiff's attempt is contrary to establish case law.

The Seventh Circuit has addressed this very issue in *Kraushaar v. Flanigan*, 45 F.3d 1040 (7th Cir. 1995). Kraushaar was arrested during a roadside safety check on 12/18/88. Kraushaar was

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

observed making furtive hand movements around the waist of his pants after he was detained. According to State Trooper Flanigan, Kraushaar smelled of alcohol and was unable to perform certain field sobriety tests. Kraushaar was transported to the Tazewell County Jail and was subsequently subjected to a strip search. Kraushaar was eventually charged with DUI but the charges were eventually dismissed for lack of probable cause to arrest Kraushaar or to believe that Kraushaar was operating a vehicle under the influence of alcohol. Kraushaar subsequently filed a § 1983 claim alleging that the officers used excessive force during the car stop and that he was subjected to an illegal strip search. In a pretrial motion, District Judge Joe B. McDade held that collateral estoppel would not be applied to the findings of no probable cause made by the State Court in the underlying DUI prosecution. The parties eventually stipulated to a trial before Magistrate Judge Robert Kauffman, who found that state troopers had probable cause for the arrest and for conducting the strip search of Kraushaar at the jail and that no unnecessary force was used in effecting the arrest. Thereafter, plaintiff filed an appeal.

On appeal, plaintiff argued that because the State Court had quashed the arrest based upon lack of probable cause, that the defendants were collaterally estopped from re-litigating the probable cause issue in Federal Court. The Seventh Circuit noted that "as a matter of due process, collateral estoppel can be used to bind only those persons who were parties or who are in privity with parties to the prior proceeding. 45 F.3d 1040, 1050. The Supreme Court has also held that the doctrine cannot be used offensively - i.e., when a plaintiff seeks to estop a defendant from re-litigating an issue which the defendant previously litigated and lost in another action - where the application of the doctrine would be unfair to a defendant." See *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327, 331 n. 7, 99 S.Ct. 645, 649-652 (1979). The Seventh Circuit recognized that the relevant issue in *Kraushaar v. Flanigan* was whether the defendants were sufficiently involved in the conduct of the

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

10

State Court litigation to actuate the principles of collateral estoppel. The Seventh Circuit noted that in the State Court proceeding, the State itself was a party to the original criminal action, but not Trooper Flanigan. Therefore, the Seventh Circuit concluded that the defendants did not have the requisite privity to the prior proceeding.

The Seventh Circuit in *Kraushaar v. Flanigan* relied upon its prior decision in *Williams v. Kobel,* 789 F.2d 463 (7th Cir. 1986). The plaintiff in *Williams* had been arrested for arson but the charges were later dismissed at a preliminary hearing for lack of probable cause. The plaintiff brought a § 1983 suit against the arresting officers, alleging that they violated his constitutional rights by arresting him without probable cause. The decision in *Williams v. Kobel* did not discuss whether the defendants were parties or privity to the original criminal proceeding, but instead viewed the issue as one of fairness under *Parklane Hosiery* standard - i.e., whether the defendants had a full and fair opportunity in the preliminary hearing to litigate the issue of whether they had probable cause to arrest Williams. The decision in *Williams v. Kobel* noted that the arresting officers had no tactical control over their presentation of the evidence. Under those circumstances, the court in *Williams v. Kobel* concluded that the defendant officers did not receive their full panoply of rights in that they were unable to fully challenge the testimony.

In the instant case, neither Officer Corsaro nor Officer McVey were represented by their own personal counsel in the underlying State case. Therefore, the defendants were not sufficiently involved in the conduct of the State Court litigation to actuate the principles of collateral estoppel. Hence, the plaintiff is prohibited from utilizing the doctrine of offensive collateral estoppel. In the absence of the State Court finding, plaintiff has failed to produce any evidence which would support his § 1983 claims.

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

**C.     Officers Corsaro and McVey Had Probable Cause to Initiate a Traffic Stop of the Vehicle the Plaintiff Was a Passenger in Because the Vehicle Did Not Have an Illuminated Rear Registration.**

Officer Corsaro had probable cause to stop the vehicle in which Defendant was a passenger due to the inoperable rear registration light (Ex. D, Par. 7). As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Wren v. United States*, 517 U.S. 806, 809-10 (1996)  Officers have probable cause for a traffic stop as long as they reasonably believed a violation was being committed, even if their belief turns out to be wrong.  *United States v. Cashman*, 216 F.3d 582, 586-87 (7th Cir. 2000).

Illinois law afforded Officer Corsaro the authority to make the stop.  Under the Illinois Traffic Code, motor vehicles are required to have a tail lamp or separate lamp that illuminates the rear registration plate so that it is clearly legible from a distance of 50 feet from the rear.  625 ILCS 5/12-201(c).  A peace officer in Illinois may arrest a person when he has reasonable grounds to believe that the person is committing or has committed an offense. 725 ILCS 5/107-2(1)(c). Based on these provisions, Officer Corsaro had the authority to initiate the traffic stop for the vehicle's failure to comply with the Illinois Traffic Code.

**D.     Officers Corsaro and McVey Legally Detained Plaintiff During the Traffic Stop and Were Justified in Calling for Canine Unit for a Dog Sniff.**

> *1.     Under the Supreme Court's recent holding in <u>Illinois v. Caballes</u>, Officers Corsaro and McVey did not need any basis to initiate a dog sniff during a traffic stop.*

Plaintiff's allegations that he was unreasonably detained during the traffic stop is without merit.   The United States Supreme Court recently clarified the standard for assessing the constitutionality of traffic stops involving dog sniffs in *Illinois v. Caballes*, 543 U.S. 405 (2005).

**HEYL ROYSTER VOELKER &ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

12

In *Caballes*, an Illinois State Trooper stopped Roy Caballes on an interstate based on probable cause that Caballes was speeding. *Caballes*, 543 U.S. at 406. As the trooper radioed in the stop, another trooper overheard the transmission and immediately headed to the scene with his narcotics-detection dog. *Id.* While one officer was writing up the warning ticket, the other officer walked the drug sniffing dog around the car. *Id.* The dog alerted at the trunk, and based on the alert, the officers searched the trunk, found marijuana, and arrested Caballes. *Id.* The entire incident lasted less than 10 minutes. *Id.* The only issue before the was whether the Fourth Amendment required reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop.

The Court recognized that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407. However, the Court concluded that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff infringed respondent's constitutionally protected interest in privacy." *Id.* at 408. The Court noted that the use of a well-trained narcotics detection dog "does not expose noncontraband items that otherwise would remain hidden from view" and therefore does not implicate legitimate privacy interests during a lawful traffic stop. *Id.* at 410 (quoting *United States v. Place*, 462 U.S. 696, 707 (1983)). Accordingly, "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id.* at 410.

In passing, the Court in *Caballes* referenced an Illinois Supreme Court decision where the court held that where officers used a dog sniff during a prolonged traffic stop, which led to the

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

discovery of contraband in the car, were products of an unconstitutional seizure. *Id.* at 407 (citing *People v. Cox*, 202 Ill. 2d 462, 782 N.E.2d 275 (2002)).

In *People v. Cox*, the officer stopped the defendant's vehicle because it did not have a rear registration light. *Cox*, 202 Ill. 2d at 464. At the time of the stop, the officer called a deputy to bring the canine unit, who arrived 15 minutes later while the officer was writing the traffic ticket. *Id.* The dog alerted to the presence of drugs, and the officers had the defendant step out of the vehicle. *Id.* The officer's search revealed marijuana on the floor board and on the defendant's person. *Id.* The Illinois Supreme Court relied on the United States Supreme Court's holding in *Terry v. Ohio*, 392 U.S. 1, 22 (1968), which required that the police may detain a person if they reasonably believe that the person has committed or is about to commit a crime. The holding in *Terry* also requires that the officer's actions must be reasonably related in scope to the circumstances which justified the interference in the first place. *Id.* at 19-20. The United States Supreme Court in *Florida v. Royer*, 460 U.S. 491, 500 (1983), noted that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."

The Illinois Supreme Court held that the officer had a reasonable basis for the traffic stop, but held that the dog sniff was not justified. The court held that the officer had no reason to request the dog sniff in that he did not smell marijuana in the vehicle, did not see any object in the vehicle that led him to suspect possession of a controlled substance, and did not testify that the defendant appeared nervous or that his answers aroused suspicion. *Cox*, 202 Ill. 2d at 469-70. The court was also concerned with the duration of the traffic stop, 15 minutes, because the record was "devoid of circumstances which would justify the length of the detention." *Id.*

Based on the holding of *Caballes*, Officer Corsaro did not violate the Plaintiff's Fourth Amendment rights by requesting a dog sniff. Similar to the traffic stop in *Cox*, Officer Corsaro

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

properly initiated the traffic stop on his reasonable suspicion that the vehicle Plaintiff was in did not have an illuminated rear registration tag. (Ex. D, Par. 7) While the United States Supreme Court did not abrogate the Illinois Supreme Court's decision in *Cox*, this case is distinguishable to *Cox* on several grounds. The officer in *Cox* pulled the defendant over for speeding. He did not have any prior, personal knowledge of the defendant's criminal history and nothing during the stop aroused the officer's suspicion that the defendant possessed narcotics.

Unlike the officer in *Cox*, Officer Corsaro had a reasonable basis in which to call for a canine unit. Officers Corsaro and McVey had prior knowledge that both Griffin and Mettler had prior drug arrests, and were both suspected of manufacturing methamphetamines. (See Exhibits D and E) After Officer Corsaro initiated the stop, he approached the vehicle and immediately recognized the driver, Jason Mettler, and the passenger, Jeremiah Griffin. (Ex. D, Par. 7)

In addition to the officers' prior knowledge, they also noted that Mettler was acting in a nervous manner. (Ex. D, Par. 7) Further, Officer Corsaro and Officer McVey saw in plain view a duffle bag in the Plaintiff's vehicle. (Ex. D, Par. 7; Ex. E. Par. 2) Officer Corsaro had independent information that the duffle bag contained methamphetamine making material. (Ex. D, Par. 6) Moreover, Officer Corsaro, Officer McVey, and Trooper Elswick observed Griffin making suspicious movements by reaching into the backseat during the car stop. (Ex. D, Par. 7; Ex. E, Par. 2; Ex. G, Par. 8 & 9) These circumstances aroused the officers' suspicion that drug activity was afoot and provided the officers' a reasonable basis to continue their investigation. Based on these factors, Officer Corsaro had reasonable, articulable suspicion to warrant requesting a dog sniff.

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

　　　　2.　　*Officers Corsaro and McVey had reasonable justification for extending the duration of the traffic stop to allow for the dog sniff based on circumstances and the officer's prior knowledge.*

Following the rationale of the Supreme Court's decision in *Terry v. Ohio*, the Seventh Circuit recognizes that the scope and duration of a traffic stop must be reasonably related to its initial purpose. *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999). While no bright line rule exists as to what would constitute a reasonable time for a routine traffic stop, the United States Supreme Court has noted that "brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *Place*, 462 U.S. at 709. Further, the Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Cox*, 202 Ill.2d at 469-70 (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). A seizure that is justified only by the need to issue a traffic ticket "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407. However, information lawfully obtained during that period may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation. *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (citations omitted). Where an officer can articulate grounds that establish reasonable suspicion of criminal activity, he may extend the duration of the traffic stop to investigate that activity. *United States v. Walden,* 146 F.3d 487, 480 (7th Cir. 1998). Whether reasonable suspicion exists depends on a consideration of the totality of the circumstances known to the officer at that time including his experiences and common sense. *United States v. Jackson*, 300 F.3d 740, 745-46 (7th Cir. 2002).

While the Illinois Supreme Court in *Cox* was concerned with the duration of the traffic stop, the court noted that its review did not find any circumstances that would justify the length of the 15

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

minute detention for the arrival of the canine unit, especially where the stop was a routine traffic one. In *Cox*, the Court held that the 15 minute wait for the canine unit's arrival was an unreasonable detention. In this case, Officer Corsaro initiated the traffic stop around 2:35 a.m., and Officer Hepner arrived with the canine unit approximately 12 minutes later, at 2:47 a.m. (See Ex. F, Par. 2)

While there may not be an appreciable difference in the period of time it took the canine unit to arrive between *Cox* and the instant case, the distinguishing factor was that while the instant case began as a traffic stop, it was hardly routine. As noted above, Officer Corsaro observed that Mettler appeared nervous. *See United States v. Brown*, 188 F.3d 860, 865 (7th Cir. 1999) (nervousness can be a factor in the totality of circumstances). Moreover, once Officer Corsaro identified the driver and passenger as Jason Mettler and Jeramiah Griffin, Officer Corsaro was aware of their prior drug arrests and information that they were both involved in the manufacture of methamphetamine. *See Jackson*, 300 F.3d at 746 (knowledge of criminal record can contribute to totality of circumstances). Furthermore, Officer Corsaro, Officer McVey, and Trooper Elswick observed several suspicious attempts by Griffin to reach into the backseat of the car. (Ex. D, Par. 7; Ex. E, Par. 2; Ex. G, Par. 8 & 9) The officers' personal knowledge of Griffin's drug activities, his suspicious efforts to reach into the backseat, the plain view of the duffle bag, and the driver's nervous behavior gave Officer Corsaro more than reasonable suspicion to warrant a longer detention. *See, e.g.*, *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (holding that 20 minute delay for arrival of drug detection dog in the early morning was not unreasonable where officers developed reasonable suspicion that suspect was trafficking narcotics after traffic stop). Based on these circumstances, there is no reason to conclude that the duration of Griffin's detention before the dog alert had to be strictly limited to the time necessary to write a traffic warning or ticket.

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

17

3.    *Officers Corsaro and McVey Developed Probable Cause to Justify Converting the Traffic Stop into a Drug Search.*

In addition to having sufficient reasonable suspicion to extend the duration of the traffic stop to allow for the dog sniff, when the dog alerted to the driver's side, rear passenger door (Ex. F, Par. 2), Officers Corsaro and McVery had probable cause to search the vehicle for narcotics and to arrest Griffin. The Seventh Circuit has recognized that once a drug dog alerts to the presence of drugs, the officer has probable cause to search the vehicle. *See United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (citing *United States v. Rogers*, 387 F.3d 925, 934 n.9 (7th Cir. 2004)). Thus, taking into account the totality of the circumstance before the dog sniff, the drug dog's alerting of the presence of narcotics elevated the officer's reasonable suspicion to probable cause to search the car. *See United States v. Patterson*, 65 F.3d 68, 71 (7th Cir. 1995) (holding that drug dog alert combined with other suspicious circumstances provided probable cause to search the vehicle), *cert. denied,* 516 U.S. 1061 (1996). Accordingly, the officers had sufficient probable cause to search the vehicle pursuant to the automobile exception to the warrant requirement. *Chambers v. Maroney*, 399 U.S. 42, 52 (1969).

**E.    Officers Corsaro and McVey had Probable Cause to Search the Trunk.**

1.    *Officers Corsaro and McVey conducted a search incident to arrest and discovered contraband, which was sufficient to establish probable cause to search the entire vehicle.*

Officers Corsaro and McVey also had sufficient probable cause to place Mettler and Griffin under arrest based on their suspicious behavior and the traffic violation. "A vehicle may be searched without a warrant if there is probable cause to believe the car contains contraband or evidence of a crime. A search of an automobile based on probable cause lawfully extends to all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments and trunks."

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

18

*United States v. Patterson*, 65 F.3d 68, 70 (7th Cir. 1995). Probable cause to search exists if, given the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Young*, 38 F.3d 338, 340 (7th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Based on the custodial arrest, the officers could search the vehicle incident to that arrest. *Rogers*, 387 F.3d at 934 n.9. Pursuant to a search incident to arrest, the officers could lawfully search the passenger compartment of the vehicle and containers that were within reach of the arrestee. *See New York v. Belton*, 453 U.S. 454, 460 (1981). However, a search incident to arrest does not automatically authorize police to perform a warrantless search of the trunk. In order to search the trunk on a search incident to arrest, the police need probable cause to believe that contraband exists in the trunk. If the police find contraband in the passenger compartment, then this constitutes probable cause to search the entire vehicle, including the trunk, for additional contraband. *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992). Similarly, where the police discovered contraband on the driver's person during search incident to arrest, this gave police probable cause to believe that the automobile contained contraband or evidence of crime, permitting a warrantless search of the automobile, including the trunk and containers. *United States v. Johnson*, 383 F.3d 538, 545-46 (7th Cir. 2004).

In this case, after the officers placed Mettler and Griffin under custodial arrest, the officers conducted a search incident to arrest in the passenger compartment of the vehicle. The officers found contraband in the passenger compartment, including but not limited to cannabis on the left passenger side floor near where the dog alerted and a powder substance on the vehicle's key chain, which tested positive for methamphetamine. (Ex. D, Par. 7; Ex. E, Par. 2) Based on this discovery, the officers had more than sufficient probable cause to search the entire vehicle, including the trunk. The officers'

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

search of the trunk revealed another bag containing methamphetamine making tools, and a jar containing liquid methamphetamine. (Ex. A, Par. 12; Ex. D, Par. 7)  Moreover, the search of Mettler's person revealed contraband in his pockets. (Ex. D, Par. 7) This finding alone would have been sufficient to give the officers probable cause to search the entire vehicle for contraband.  Thus, Officers Corsaro and McVey had probable cause to search the trunk after finding contraband in the vehicle.

> 2.  *Alternatively, Officers Corsaro and McVey could have conducted an inventory search that would have led to the discovery of the contraband in the trunk.*

Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment. *United States v. Wilson*, 938 F.2d 785, 788 (7th Cir. 1991).  A police search conducted before the towing is "lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property and protecting the police from the owner's charging them with having stolen, lost, or damaged his property. *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005).

Monmouth Police Department has a standard procedure for conducting an inventory search and the officers conducted the search pursuant to department policy. (Ex. D, Par. 8; Ex. E, Par. 3) Hence, the officers would have discovered contraband in the trunk even if they did not have probable cause to search the trunk.  After Mettler and Griffin were arrested and transported, the police impounded the vehicle.  Prior to towing, the police could conduct a lawful inventory search of the vehicle that could have revealed the contraband in the trunk that would be admissible as evidence. Further, the police could have also waited until after the vehicle was impounded and towed to conduct an administrative inventory search.  Either way, the officers had an alternative, lawful method for searching the vehicle's trunk.

**HEYL ROYSTER VOELKER & ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

20

**F.    Officers Corsaro and McVey Are Immune from Plaintiff's Lawsuit as They Had a Reasonable Basis to Believe That Probable Cause Existed to Search and Seize Plaintiff.**

Because Officers Corsaro and McVey had probable cause to initiate the traffic stop, to search the vehicle, and to arrest Mettler and Griffin, they are entitled to qualified immunity.  Police officers are entitled to qualified immunity for actions taken during a stop or arrest "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001) (citing *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity, as applied in the context of an alleged unlawful arrest, will shield a police officer from § 1983 liability if "a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officer possessed."  *Eversole v. Steele*, 59 F.3d 710, 717 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).  "If a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial <u>if there is any reasonable basis</u> to conclude that probable cause existed."  *McDonnell v. Cournia*, 990 F.2d 963, 968 (7th Cir. 1993) (quoting *Cross v. Des Moines*, 965 F.2d 628, 632 (8th Cir. 1992)).

In *Smith*, the defendant claimed that the officers violated his Fourth Amendment rights for searching him, his vehicle's glove box, the passenger compartment, and the trunk. *Smith*, 242 F.3d at 742.  The officers had reasonable suspicion to conduct an investigatory stop of Smith when they believed he committed a traffic offense and then would not pull over for 12 blocks after the officers activated their siren.  *Id.*  Smith could not produce proof of valid car insurance, so the officer's arrested him based on probable cause.  *Id.* at 743.  The officers then conducted a search incident to the arrest, and discovered contraband.  *Id.*  The district court noted that the search of the trunk may

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

have been unlawful if the officers did not have probable cause to search the trunk, but held that the law was not clear at the time such that a reasonable official would not have known that he may have been violating a clearly established right. *Id.* Smith argued that the search was unlawful because he committed a minor traffic violation. *Id.* The Seventh Circuit affirmed the district court's finding that the officers were entitled to qualified immunity because their arrest and search incident to the arrest were supported by probable cause. *Id.*

Similar to *Smith*, Officers Corsaro and McVey are entitled to qualified immunity because they had probable cause to support their actions. First, the officers had probable cause to initiate the traffic stop on the grounds that the vehicle did not have an operating rear registration light as required by the Illinois Traffic Code. Officers Corsaro and McVey also had reasonable suspicion and probable cause to search the vehicle. Upon identifying the driver and passenger, Officer Corsaro knew of the vehicle's occupant's recent drug arrests and involvement in the manufacture of methamphetamines. Officer Corsaro noted that Mettler appeared nervous. Officer Corsaro also saw in plain view a duffel bag in the vehicle, which corroborated an informant's tip that the vehicle would contain such a bag with methamphetamine making materials inside. Taking these factors in consideration with the fact that the drug dog alerted at the driver's side passenger door, the officers had probable cause to conduct the drug search.

When Mettler and Griffin refused to exit the vehicle to allow for the drug search, Officers Corsaro and McVey had probable cause to arrest and place them in custodial arrest. Officer McVey also saw Griffin repeatedly place his hands in the back seat and refused to comply with Officer McVey's commands to keep his hands visible.

After the dog alerted, Officer Corsaro ordered Mettler out of the car. Both occupants refused and Mettler started the car, signaling his intention to flee. The occupants refused to comply with the

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

officers orders to exit the vehicle. (Ex. D, Par. 7; Ex. E, Par. 2) Based on Griffin's failure to comply

with the officers orders, the officers were presented with a situation that any reasonable officer would

have found it lawful to arrest Mettler and Griffin.

Based on the arguments and case law outlined above, (1) plaintiff cannot pursue a Fourth

Amendment claim for the car stop or the subsequent search which occurred on 6/21/05, and (2)

the defendants are entitled to qualified immunity.

WHEREFORE, the defendants, OFFICER DOUG CORSARO and OFFICER JIMMY

McVEY, JR., pray that the court deny plaintiff's Motion for Summary Judgment and enter

summary judgment in their favor.

OFFICER DOUG CORSARO and OFFICER
JIMMY MCVEY, JR.

By: _____/s/ David A. Perkins_____
HEYL, ROYSTER, VOELKER & ALLEN
David A. Perkins - #6195542
John K. Kim - #6286591
Suite 600, 124 S. W. Adams Street
Peoria, IL 61602
(309) 676-0400
(309) 676-3374 (fax)
dperkins@hrva.com
jkim@hrva.com

**HEYL ROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

23

## CERTIFICATE OF SERVICE

I hereby certify that on May 4th, 2007, I electronically filed the foregoing Response to Plaintiff's Motion for Summary Judgment and Defendants' Cross Motion for Summary Judgment, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Jeramiah J. Griffin, pro se
#13688-026
Federal Correctional Complex - Med.
P.O. Box 3000 - Medium
Forrest City, AR 72336

/s/ David A. Perkins

David A. Perkins #6195542
John K. Kim #6286591

Attorneys for Defendants,
OFFICER DOUG CORSARO and OFFICER
JIMMY MCVEY, JR.
HEYL, ROYSTER, VOELKER & ALLEN
Suite 600, 124 S. W. Adams Street
Peoria, IL 61602
(309) 676-0400
(309) 676-3374 (fax)
dperkins@hrva.com
jkim@hrva.com

DAP/srg
G:\07\R1307\R1307PMI 008 Motion for Summary Judgment 040307.wpd

**HEYL ROYSTER
VOELKER
& ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

E-FILED
Friday, 04 May, 2007  11:18:27 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT ROCK ISLAND

JERAMIAH J. GRIFFIN,           )
                               )
        Plaintiff,             )
                               )
VS.                            )        NO. 06-4051
                               )
                               )
                               )
OFFICER DOUG CORSARO and       )
OFFICER JIMMY McVEY, JR.,      )
                               )
        Defendants.            )

DEPOSITION

OF

JERAMIAH J. GRIFFIN

JANUARY 5, 2007



EXHIBIT
A

ALPHA REPORTING CORPORATION
236 Adams Avenue
Memphis, TN 38103
901-523-8974
www.alphareporting.com

ENTERED

JAN 3 1 2007

CXA

Page 2

The deposition of JERAMIAH J. GRIFFIN is taken on this, the 5th day of January, 2007, on behalf of the Defendants, pursuant to notice and consent of counsel, beginning at approximately 9:17 a.m., at the Federal Correctional Complex, Forrest City, Arkansas.

This deposition is taken pursuant to the terms and provisions of the Federal Rules of Civil Procedure.

All forms and formalities, including the signature of the witness, are waived, and objections alone as to matters of competency, irrelevancy and immateriality of the testimony are reserved to be presented and disposed of at or before the hearing.

Page 4

I N D E X

Witness:                          Page
Jeramiah J. Griffin
    Direct Examination by Mr. Perkins          5


                    EXHIBITS
1        Plea agreement               22

Page 3

A P P E A R A N C E S

FOR THE PLAINTIFF:     PRO SE


FOR THE DEFENDANT:     DAVID PERKINS, ESQ.
                Heyl Royster Voelker
                & Allen
                103 West Vandalia
                Suite 100
                Edwardsville, IL  62025




COURT REPORTING FIRM:
        ALPHA REPORTING CORPORATION
        Sandra J. Vaughn, Court Reporter
        236 Adams Avenue
        Memphis, Tennessee 38103
        (901) 523-8974
        www.alphareporting.com

Page 5

1              JERAMIAH J. GRIFFIN,
2    having been first duly sworn, was examined and
3    testified as follows:
4              DIRECT EXAMINATION
5    BY MR. PERKINS:
6    Q    Would you state your full name for the record?
7    A    Jeramiah James Griffin.
8    Q    How old are you?
9    A    Twenty-six.
10   Q    It's kind of a hollow sound.  If you can speak
11   up a little bit more and make sure she can hear you.
12   This is your deposition pursuant to the federal
13   lawsuit you filed against two police officers.  I
14   have several questions for you today.  Hopefully it
15   won't take more than an hour.
16        Make sure you understand my question and answer
17   audibly.  You can't shake your head.  Answer yes or
18   no and try to avoid saying uh-huh or un-un.  Be
19   patient with me and let me finish my question before
20   you answer.
21   A    Yes.
22   Q    Because I'm going to try to read things and
23   think of the questions, wait until I'm done before
24   you answer.
25   A    Yeah.

2 (Pages 2 to 5)

| | Page 6 |
|---|---|
| 1 | Q   You at one time resided in the Monmouth, |
| 2 | Illinois area, correct? |
| 3 | A   Yes. |
| 4 | Q   You were arrested by Officer Corsaro and McVey |
| 5 | in June of 2005, correct? |
| 6 | A   Yes. |
| 7 | Q   Let's talk a little bit about your criminal |
| 8 | history.  Prior to June of 2005, the date of your |
| 9 | arrest, had you been arrested on any occasion? |
| 10 | A   Before that, yes. |
| 11 | Q   Let's start with your first adult offense. |
| 12 | A   Burglary of motor vehicle. |
| 13 | Q   What year was that roughly? |
| 14 | A   Ninety-seven or '98, around that time. |
| 15 | Q   Anything after that? |
| 16 | A   Yes.  I have got a lot, minor stuff, too, |
| 17 | disorderly conduct, traffic violations.  I have got a |
| 18 | residential burglary, aggravated battery. |
| 19 | Q   Residential burglary, what year? |
| 20 | A   2002.  Aggravated battery, 2002, unlawful |
| 21 | possession of chemicals in 2002. |
| 22 | Q   What kind of chemicals? |
| 23 | A   Manufacturing chemicals. |
| 24 | Q   Manufacturing chemicals for methamphetamines? |
| 25 | A   Yes, sir. |

| | Page 7 |
|---|---|
| 1 | Q   What county was that? |
| 2 | A   Warren.  I had a probation violation in '99.  I |
| 3 | went to boot camp.  I got out of -- retail theft |
| 4 | 2001 -- I went there six months, just minor stuff.  I |
| 5 | can't think of everything. |
| 6 | Q   All right.  The vehicle you were in was a 2000 |
| 7 | Pontiac Grand Am four-door, correct? |
| 8 | A   Yes, sir. |
| 9 | Q   That vehicle was owned by -- was it your |
| 10 | girlfriend at the time? |
| 11 | A   Sister-in-law. |
| 12 | Q   And I have got her name somewhere in the |
| 13 | report, can you -- |
| 14 | A   Tilliea Cooper. |
| 15 | Q   Were you driving that vehicle that night? |
| 16 | A   No.  I was a passenger. |
| 17 | Q   Jason Metler was the driver.  The vehicle was |
| 18 | stopped June 21, 2005 at about 2:35 a.m., correct? |
| 19 | A   Yes. |
| 20 | Q   Where were you prior to that?  Were you in |
| 21 | Galesburg? |
| 22 | A   Yes. |
| 23 | Q   With Metler? |
| 24 | A   Yes. |
| 25 | Q   Anyone else? |

| | Page 8 |
|---|---|
| 1 | A   No.  My pit bull. |
| 2 | Q   And you were doing what in Galesburg? |
| 3 | A   Purchasing a headlight at Wal-Mart. |
| 4 | Q   You drove all the way to Galesburg just for |
| 5 | that? |
| 6 | A   Yes.  Wal-Mart is the only thing in that area |
| 7 | open at that time of night. |
| 8 | Q   What time were you doing that? |
| 9 | A   Around midnight. |
| 10 | Q   Where were you prior to that? |
| 11 | A   Tonsey Bennett's |
| 12 | Q   Tonsey lives where? |
| 13 | A   I think 1245 East Broadway. |
| 14 | Q   In Galesburg? |
| 15 | A   No, Monmouth. |
| 16 | Q   What were you doing there? |
| 17 | A   Just hanging out. |
| 18 | Q   And then you were stopped at 2:35 a.m.? |
| 19 | A   Yeah. |
| 20 | Q   Near 200 Avenue near North Street; is that |
| 21 | correct? |
| 22 | A   Yes. |
| 23 | Q   Did you see any squad cars before the red |
| 24 | lights came on? |
| 25 | A   Yeah. |

| | Page 9 |
|---|---|
| 1 | Q   Where did you see a squad car? |
| 2 | A   When I was coming into town on the edge of |
| 3 | town.  We were coming into town and we passed |
| 4 | Corsaro, and we got three or four more blocks into |
| 5 | town and he pulled us over. |
| 6 | Q   You came in what route? |
| 7 | A   By the English Club.  I don't know the route. |
| 8 | Q   It's not 30? |
| 9 | A   It might be.  We came in right by the English |
| 10 | Club. |
| 11 | Q   You saw a squad car pull behind you guys? |
| 12 | A   We turned right, then left.  About a block down |
| 13 | the road, he turned the lights on. |
| 14 | Q   The state trooper -- strike that.  The state |
| 15 | trooper said that a registration light was out.  Do |
| 16 | you know whether or not that was true? |
| 17 | A   I never got it checked, got out to look at it. |
| 18 | Q   The registration light could have been |
| 19 | inoperable, and you don't know one way or other? |
| 20 | A   Yeah, I don't know.  Two weeks prior to that, |
| 21 | Officer Corsaro stopped me and Tilliea on the square |
| 22 | in Monmouth and said we needed to get the light |
| 23 | fixed.  Scott Pence fixed the light two weeks prior |
| 24 | to that. |
| 25 | Q   After the warning? |

3 (Pages 6 to 9)

Alpha Reporting Corporation
901.523.8974

Page 10

1   A    Two and a half to three weeks prior to getting
2   arrested.
3   Q    P-E-N-C-E?
4   A    Yeah.
5   Q    Where does he live at?
6   A    One fourteen and a half South Fifth Street, I
7   think.
8   Q    In Monmouth?
9   A    Yeah.
10  Q    At the time the car stopped, you don't know if
11  it was inoperable or not?
12  A    You are right.
13  Q    What was your first indication the vehicle was
14  being stopped?
15  A    When he turned the lights on.
16  Q    Did when the lights -- strike that.  When the
17  emergency red lights went on, or when you and Metler
18  were aware that a squad car was pulling in behind the
19  vehicle you were in, did Metler attempt to hide any
20  contraband in the vehicle?
21  A    No, not that I am aware of.
22  Q    Did he have any contraband on him that night?
23  A    I don't know what he had on him.  He had a
24  pocket knife.
25  Q    Did he have any drugs on him?

Page 11

1   A    And a key chain, it was later recovered after
2   the search.
3   Q    You are speaking of traces of illegal
4   substances on his key chain?
5   A    Yes.
6   Q    Were you aware of him possessing any other
7   drugs?
8   A    There was drugs in the car, yeah.
9   Q    Were you aware of him possessing any other
10  drugs?
11  A    No.
12  Q    When you first became aware of the squad car,
13  did you attempt to hide any contraband or drugs in
14  the vehicle?
15  A    No.
16  Q    There were drugs in the vehicle, correct?
17  A    Yeah.  The drugs in the vehicle were already
18  there.
19  Q    Who owned the drugs in the vehicle?
20  A    I mean, I guess you could say me.  I'm here for
21  it.  He is part of it, but he signed a proffer
22  against me.  He got complete immunity from the feds
23  to sign a proffer against me.  That is why he is not
24  locked up.  You can say both of us actually.
25  Q    When did you first put those drugs in the

Page 12

1   vehicle?
2   A    I might have had them in my pocket when I got
3   in the car.
4   Q    When you left Galesburg?
5   A    No, Monmouth.
6   Q    What specifically are you referring to?
7   A    Marijuana, two ounces of weed.
8   Q    There were drugs in the vehicle other than
9   that, correct?
10  A    Yeah.  There was some dope in the trunk.
11  Q    What other drugs were in the vehicle?
12  A    The methamphetamine.  That's it.
13  Q    The marijuana you said was in your pocket, two
14  ounces?
15  A    Actually when I we got arrested, it was under
16  the floor mat in the backset.
17  Q    When you were driving in the village of
18  Monmouth, where was it?
19  A    In my pocket.
20  Q    When did you take it out of your pocket?
21  A    When we got in the car to go to Galesburg.
22  Q    You put marijuana in your --
23  A    The marijuana was in my pocket when I got in
24  the car.  When I got in the car, I slid it under the
25  floor mat on the passenger side.

Page 13

1   Q    But when you were driving into Monmouth just
2   before your vehicle was stopped by Corsaro, where was
3   the marijuana at?
4   A    It was hid underneath the floor mat, couldn't
5   have seen it.  The back windows were tinted on the
6   car.  He couldn't have looked in the car and seen
7   nothing.
8   Q    You said there was some dope in the trunk.
9   What specifically?
10  A    Eight hundred something grams of
11  methamphetamine.
12  Q    When was that put in the trunk?
13  A    An hour or two prior to the arrest.
14  Q    Who put that in there?
15  A    Me and Jason.
16  Q    Where did you retrieve it from?
17  A    Out in the country.
18  Q    Did he manufacture it in the country?
19  A    No.  It was sitting out there three weeks prior
20  to that.  We decided to go out and pick it up that
21  night.
22  Q    At a hiding spot?
23  A    Yes.
24  Q    Was it in a duffle bag?
25  A    Yes.  It was sealed.  You couldn't see nothing

Alpha Reporting Corporation
901.523.8974

Page 14

1   in the trunk.
2   Q       Then you said there was methamphetamine in the
3   vehicle itself?
4   A       In the key chain, the one key he had.
5   Q       Were there other drugs in the passenger area of
6   the vehicle?
7   A       I didn't have no drugs on me.  I had twelve
8   hundred dollars cash on me.
9   Q       It was your money?
10  A       Yes.
11  Q       Did you tell the officers that was your money?
12  A       Yeah.
13  Q       So, you guys are driving into town.  You see
14  the red lights.  Was there any attempt by you to
15  remove any drugs from your person --
16  A       No.
17  Q       Let me finish the question.  When driving into
18  town, was there any attempt by you once you saw
19  Corsaro or when the red lights came on to take any
20  drugs off your person and hide them in the car?
21  A       No.
22  Q       Corsaro was by himself in his car?
23  A       Yes.
24  Q       He was the only squad car present initially at
25  the stop?

Page 15

1   A       For about two minutes.
2   Q       Did he approach the driver's side and talk to
3   Metler?
4   A       Yes.
5   Q       What was the first thing Corsaro said?
6   A       First, Jason asked why he was pulling us over.
7   He said for the registration light.  Then they
8   engaged us in conversation about personal stuff Jason
9   talked to him about.  Then he asked what we was
10  doing.  Told him we was coming back from Galesburg
11  from Wal-Mart for getting a headlight.
12  Q       Was there a headlight out on the vehicle?
13  A       If on dim, one light was out.  We were driving
14  with brights on.  If looking at it, you wouldn't be
15  able to tell.  He ran it for driver's license
16  information on me.  He called in driver's license
17  information on me.  I'm not driving the car.  He ran
18  my name.  He never ran Jason's name at all.
19  Q       Did he ask Metler for his driver's license?
20  A       No.
21  Q       Corsaro knew you and Metler?
22  A       Yes.
23  Q       He had a portable radio with him apparently?
24  A       Yes.
25  Q       He ran information on you?

Page 16

1   A       By that time, McVey.
2   Q       Did he run information on you?
3   A       He did on me.  He did a warrant check.  He
4   didn't run driver's license information on nobody but
5   me.
6   Q       Then what happened?
7   A       It came back suspended, clear.  I didn't have
8   no warrants.  Jason didn't have no warrants.  And he
9   engaged in, can I search the car?  I was like, no.
10  Q       He asked who that?
11  A       Jason.
12  Q       Jason said no?
13  A       Right.
14  Q       Your pit bull was in the back seat?
15  A       This time I have the dog and leash because he
16  is getting agitated.
17  Q       The dog's name was Rigsby?
18  A       Yes.
19  Q       That was your dog?
20  A       Yes.
21  Q       He was showing some aggression?
22  A       Yeah, until I told him to calm down, sit down.
23  Q       Did Corsaro do anything else before McVey
24  showed up?
25  A       He just got to arguing with us about wanting to

Page 17

1   search the car.  We told him no, you don't don't have
2   no warrant.  We're not drunk.  We have a valid
3   driver's license.  Our car, we're not going to let
4   you search, man.  He got to arguing with us.  He said
5   fine, I will call the canine car.
6           He stepped back about two feet back off the
7   car.  At this time, McVey was on my side, passenger
8   side.  I'm talking to McVey, and he is arguing with
9   him about searching the car.  Dispatch had to call
10  the canine cop to come to the scene and run the dog
11  around the car.
12  Q       How much time do you think elapsed before the
13  canine showed up?
14  A       Fourteen minutes.  Two minutes he had prior to
15  calling it in, and took twelve minutes to get there.
16  Q       Just your personal knowledge?  We can always
17  get the dispatch sheet.
18  A       About fourteen or fifteen minutes.
19  Q       And so Officer Hepner was the canine unit
20  officer, H-E-P-N-E-R?
21  A       Yes, sir.
22  Q       He showed up with the dog, correct?
23  A       Yes, sir.
24  Q       And did the officers eventually tell you that
25  the dog hit on the car?

5 (Pages 14 to 17)

Page 18

1   A    No.  When Hepner showed up, they talked for a
2   second, and by that time, four or five cops were
3   there, and they talked.  Then he got on the loud
4   speaker on the cop car and requested you roll your
5   windows up.  They were going to run the dog around
6   the car.  We rolled the windows up, and he ran the
7   dog around two times.
8   Q    Did someone eventually tell you the dog hit on
9   the car?
10  A    Yeah.
11  Q    You didn't see what the dog was doing when
12  walking around the vehicle?
13  A    The dog wasn't doing nothing.  He walked once,
14  talked to Corsaro, shined a light in the car and saw
15  the backpack with dirty clothes in it.  The dog hit
16  on the car.  The dog jumped on the car.
17  Q    How does that dog indicate drugs in a car?
18  A    I don't know.
19  Q    You don't know how?
20  A    Jumped on the car, could have sat down.  The
21  window is tinted where the dog was.
22  Q    You don't know how the dog was trained to
23  indicate, right?
24  A    No. I don't know.
25  Q    They eventually told you it indicated there

Page 19

1   were drugs in the car?
2   A    Yeah.
3   Q    Then what happened?
4   A    I said, man, you weren't searching this car,
5   you don't have no reason, you are harassing.  McVey
6   busted out the window.
7   Q    Did he first instruct you to get out of the
8   car?
9   A    Yes.
10  Q    And you both refused, correct?
11  A    Yes.
12  Q    Then Metler actually put the vehicle in gear
13  and tried to drive away?
14  A    Metler hit the ignition, and when he hit the
15  key, I locked the door and shut the door off.
16  Q    When he hit the ignition, he was trying to
17  start the vehicle?
18  A    No, to lock the vehicle.
19  Q    Are you denying he tried to drive away from the
20  scene?
21  A    When he turned the key over, the lights came
22  on.  They assumed.  The car never started.
23  Q    You are denying he attempted to leave the
24  scene?
25  A    How could he leave the scene with the car

Page 20

1   parked in front of him?
2   Q    The state trooper was there, correct?  Did you
3   know him?
4   A    No.  We argued we're got getting out of the
5   car.  I'm not denying we did that.
6   Q    After you refused to exit the vehicle --
7   A    They busted out the passenger window.  Jason
8   ran out the door and was fighting.  The cops busted
9   the window and was pepper-spraying the interior of
10  the car.
11  Q    Were you under the influence of any drugs or
12  alcohol?
13  A    No. I didn't smoke weed. I was on parole.
14  Q    How about Metler?
15  A    I had been with him all night, none to my
16  knowledge.
17  Q    The two of you were forcibly removed from the
18  vehicle?
19  A    I didn't get forcibly removed.  I got out and
20  got on my knees.  They maced the car, and he was
21  hitting in the car until we get Metler under
22  control.  I got out and got on my knees and they
23  cuffed me.
24  Q    After you were cuffed, did he find any drugs on
25  your person?

Page 21

1   A    No.
2   Q    Both of you were cuffed and put in the squad
3   car?
4   A    I was put in one, him in another.
5   Q    Were you there when they were searching the
6   vehicle, the Grand Am?
7   A    No.
8   Q    You don't know what they found and where?
9   A    Only thing I know is from police reports.
10  Q    Then you were taken to Monmouth Police
11  Department or Warren County Sheriff's Department?
12  A    Warren County Sheriff's Department.
13  Q    You have read all the police reports, correct?
14  A    Yes, sir.
15  Q    You have seen the list of evidence seized from
16  the vehicle, correct?
17  A    Yes.
18  Q    You don't deny that all the contraband or drugs
19  seized from -- the evidence, you don't deny it was in
20  the vehicle?
21  A    No.
22  Q    You don't deny that?
23  A    No.
24  Q    In fact, you admit that it was owned by you and
25  Metler, correct?

Alpha Reporting Corporation
901.523.8974

Page 22

1   A    I admitted it was in the car.  I'm not going to
2   admit to who it was owned by.
3   Q    Did you -- during the car stop, did you ever
4   encourage your dog to attack the officers?
5   A    No.
6   Q    Did you ever threaten the officers you were
7   going to turn the dog loose on them?
8   A    No.
9   Q    You signed a plea agreement when you were
10  prosecuted by the federal prosecutor, correct?
11  A    Yeah.
12  Q    And there was a factual basis to that.  Do you
13  recall that?
14  A    Yeah.
15  Q    I will hand you a copy of the cooperation plea
16  agreement and stipulation of facts which was filed on
17  April 26, 2006, and we will stop for a minute and
18  mark that.
19        (Whereupon, the above-mentioned
20  document was marked as Exhibit 1.)
21  BY MR. PERKINS:
22  Q    I direct your attention to page 15 of Exhibit
23  1.  Let me back up.  First of all, this is the
24  agreement that you signed that is marked Exhibit 1,
25  correct?

Page 23

1   A    Yeah.
2   Q    On page 15, paragraph 25, you indicated you
3   were pleading guilty because, in fact, you were
4   guilty, correct?
5   A    Yeah.
6   Q    You indicated that on June 21, 2005 you and
7   another individual endeavored to obtain
8   methamphetamine, which was to be distributed in
9   Warren County, correct?
10  A    Yeah.
11  Q    In paragraph 25B you indicated that during the
12  early morning hours of June 21, 2005 you had a bag in
13  the automobile in which you were a passenger and that
14  the bag had two jars of methamphetamine, correct?
15  A    Yeah.
16  Q    You indicated in paragraph C on page 16 you had
17  been involved in obtaining methamphetamine for
18  distribution prior to arrest on June 21, 2005,
19  correct?
20  A    Yes.
21  Q    When the emergency red lights came on at the
22  initial stage of the car stop, did you ever turn
23  around to look at the squad car?
24  A    No.
25  Q    Which way were you looking?

Page 24

1   A    Forward.  I already knew who it was when we
2   passed them.  He had been harassing me for weeks and
3   weeks prior to this.
4   Q    You didn't know what Metler was doing?
5   A    He was driving the car.
6   Q    I just want you to answer my questions.  It's
7   not a chance for you to stand here and give a
8   speech.  Your opportunity to tell your version is
9   some other point in time.  You don't know what Metler
10  was doing every given second during the stop; is that
11  correct?
12  A    He was driving the car.
13  Q    Do you know everything he was doing every
14  second?
15  A    He was sitting right beside me.  He was driving
16  the car.
17  Q    Do you know exactly what he was doing?
18  A    Yeah.  I know what he was doing.
19  Q    You don't know what confidential information
20  Officer Corsaro or other members of the Monmouth
21  Police Department received prior to your car stop on
22  June 21, 2005; is that correct?
23  A    He didn't even know what he had.  He couldn't
24  point to one thing he had.  No.  I didn't know
25  nothing.  It's obvious he didn't know nothing either

Page 25

1   when he went in front of court.
2   Q    It's a yes or no answer.  You don't know what
3   confidential information Officer Corsaro received
4   before the June 21, 2005 car stop; is that correct?
5   A    No.
6   Q    Is that correct?
7   A    No.  I don't know what he had.
8   Q    So, my statement is correct?
9   A    That's correct.
10  Q    You had been arrested by Corsaro before?
11  A    Maybe once.  I don't remember.
12  Q    You were fairly well-known to the members of
13  the Monmouth Police Department at that time?
14  A    Been in Monmouth my whole life.
15  Q    They knew you because of your criminal history
16  and prior criminal activities, correct?
17  A    You could say that, yeah.
18  Q    Including your prior conviction for manufacture
19  of methamphetamines, correct?
20  A    Yeah.
21  Q    Were you in the vehicle when Tilliea Cooper was
22  stopped two weeks earlier?
23  A    No.
24  Q    Who stopped her?
25  A    Officer Corsaro.

7 (Pages 22 to 25)

Page 26

1  Q    Was that for the registration light warning?
2  A    No.
3  Q    He didn't arrest you on that occasion?
4  A    He was harassing us. He didn't arrest us.
5  Q    He could have arrested you though if he wanted
6  to?
7  A    He didn't have no reason to. For what?
8  Q    He didn't arrest you on that occasion. There
9  was a silver circular pill container on the key
10  chain; was that correct?
11  A    Yes.
12  Q    Whose key chain was it?
13  A    It was Tilliea's actually, owner of the car.
14  Q    Where was she at this time?
15  A    She was in bed.
16  Q    There were coffee filters in the vehicle; is
17  that correct?
18  A    Yes.
19  Q    Nineteen white prescription tablets?
20  A    Yes.
21  Q    What was that?
22  A    Some -- I can't remember what type of pill it
23  was. Nothing illegal.
24  Q    There was a jar of liquid methamphetamine,
25  couple of jars, correct?

Page 27

1  A    Yes.
2  Q    Charges were filed against you by the Warren
3  County state's attorney, correct?
4  A    Yes.
5  Q    And then you got a public defender, correct?
6  A    Yes.
7  Q    Your public defender filed a motion to
8  suppress, which was granted?
9  A    Yes.
10  Q    And charges were dropped?
11  A    Yes.
12  Q    And then the federal prosecutor prosecuted you
13  for the same offense?
14  A    No. For a different offense.
15  Q    Slightly different, still for possession?
16  A    I got conspiracy to distribute, not
17  possession. It's totally different. Right here, my
18  charge, conspiracy to possess with intent to
19  distribute. It arises from the same thing.
20  Q    It's out of the same car stop, correct?
21  A    Yeah.
22  Q    Had you been arrested in Peoria, Illinois a
23  week before that car stop?
24  A    Galesburg, a month before.
25  Q    Galesburg officers, when they arrested you,

Page 28

1  were you in possession of methamphetamines?
2  A    Quarter gram was found in the car, yeah.
3  Q    You were arrested?
4  A    Yeah, me and my son's mother, yeah, quarter
5  pound of weed, a thousand dollars.
6  Q    Were you employed at the time?
7  A    No.
8  Q    Where did the twelve hundred dollars come from?
9  A    Tilliea works. My old lady works.
10  Q    You were married at the time?
11  A    No.
12  Q    You said your old lady?
13  A    My son's mother. She was with me when I got
14  arrested in Galesburg.
15  Q    Who is that?
16  A    Ashley Hoopes.
17  Q    Metler had been arrested prior to that date,
18  correct?
19  A    Two years, three years, prior to that.
20  Q    For what?
21  A    I think attempt to deliver.
22  Q    So, at the time both of you had had convictions
23  for drug offenses; is that correct?
24  A    Yeah.
25  Q    Metler eventually gave -- signed a document

Page 29

1  under oath, gave information to the federal
2  prosecutor assisting the federal prosecutor, correct?
3  A    Yeah.
4  Q    Did he assist you in manufacturing that
5  methamphetamine found in the car?
6  A    No.
7  Q    Why did you say initially it was both of yours?
8  A    It was out in the country. It was sitting
9  there two or three weeks. We went and put it out
10  there.
11  Q    Who put it there initially?
12  A    I did.
13  Q    Metler said that your practice was that you
14  would drive out in the country and stop places and
15  manufacture the methamphetamine?
16  A    I don't know what he said.
17  Q    Is that correct?
18  A    That is what he told the prosecutor.
19  Q    Is that correct though?
20  A    No.
21  Q    Where did you manufacture it?
22  A    Various places.
23  Q    At a house or out in the open?
24  A    House sometimes, out in the open, just
25  depends. Never riding down the road, no.

8 (Pages 26 to 29)

Page 30

1     MR. PERKINS:  That is all I have.
2
3         AND FURTHER DEPONENT SAITH NOT.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 31

1         C E R T I F I C A T E
2     STATE OF TENNESSEE:
3     COUNTY OF SHELBY:
4         I, Sandra J. Vaughn, Court Reporter and
      Notary Public, Shelby County, Tennessee, CERTIFY:
5
6         The foregoing proceedings were taken before
      me at the time and place stated in the foregoing
7     styled cause with the appearances as noted.
8
9         Being a Court Reporter, I then reported the
      proceedings in Stenotype, and the foregoing pages
      contain a true and correct transcript of my said
10    Stenotype notes then and there taken.
11
12        I am not in the employ of an am not related
      to any of the parties or their counsel, and I have no
      interest in the matter involved.
13
14        I further certify that in order for this
      document to be considered a true and correct copy, it
15    must bear my signature seal, and that any
      reproduction in whole or in part of this document is
16    not authorized and not to be considered authentic.
17
18        Witness my signature this the
      _____ day of _____, 2007.
19
20            SANDRA J. VAUGHN
21
      Notary Public at Large
22    For the State of Tennessee
23        My Commission Expires:
          March 4, 2009
24
25

Alpha Reporting Corporation
901.523.8974

E-FILED
Friday, 04 May, 2007  11:19:23 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

JERAMIAH J. GRIFFIN,            )
                               )
            Plaintiff,         )
                               )
      -vs-                     )   No. 06-4051
                               )
OFFICER DOUG CORSARO, and      )
OFFICER JIMMY MCVEY, JR.,      )
                               )
            Defendants. )

THE DEPOSITION OF JASON METTLER, taken before
Amy S. Powers, Illinois CSR 084-003053, RPR
038540, a Notary Public, on Wednesday, the 6th
day of December 2006, commencing at the hour of
1:00 p.m., at 250 East Main Street, Suite 316, in
the City of Galesburg, County of Knox, and State
of Illinois.

CIRCUIT WIDE REPORTING
Suite 316 Hill Arcade Building
Galesburg, Illinois 61401
(309) 343-3376 * 1-800-342-DEPO

---

**2**

PRESENT:

DAVID A. PERKINS, ESQ.,
124 S.W. Adams Street, Suite 600
Peoria, Illinois 61602
on behalf of the Defendants.

I N D E X

WITNESS                                    PAGE
JASON METTLER,
    Examination by Mr. Perkins             3 - 27
    Certificate of Reporter               28 - 29

EXHIBITS
No Exhibits

EXHIBIT
B

---

1  (Witness sworn.)
2  JASON METTLER,
3  having been first duly sworn, was examined and
4  testified on his oath as follows:
5
6  **EXAMINATION BY MR. PERKINS:**
7  Q.   Would you state your full name for the
8       record, please.
9  A.   Jason Carl Mettler.
10 Q.   Jason, how old are you?
11 A.   25 years old.  My birth date is 8-09-81.
12 Q.   Okay.  And where do you reside?
13 A.   1127 South 5th in Monmouth, Illinois.
14 Q.   Okay.  And you said you were employed on a
15      farm?
16 A.   Yeah.
17 Q.   What company or --
18 A.   Reeder.
19 Q.   R-E-E-D --
20 A.   Yeah.
21 Q.   -- E-R?
22 A.   Yeah.
23 Q.   And that's located where?
24 A.   Out by Little York.  It's on Highway 94, I

---

**4**

1       think.
2  Q.   Do you know who Jeramiah Griffin is?
3  A.   Yes, sir.
4  Q.   Tell me when you first met him and how you
5       knew him.
6  A.   I've known him for years.  Just from being
7       in Monmouth.
8  Q.   Since what year do you think?
9  A.   I've known him for a probably good ten
10      years.
11 Q.   And he's currently incarcerated, correct?
12 A.   Uh-huh.
13 Q.   You'll have to say yes or no.
14 A.   Yes.
15 Q.   When was the last time you talked to him?
16 A.   The last time was the day before we got out
17      of jail.
18 Q.   And "out of jail" meaning after you were
19      arrested on 6-21-05?
20 A.   Yeah.  I think it was -- I can't recall what
21      the date was.  It's been a year or something
22      ago.
23 Q.   Okay.  On 6-21-05 the two of you were in a
24      vehicle that was stopped in Monmouth and

5

1   both of you were arrested, correct?
2  A.   Yes, sir.
3  Q.   And then there was a Motion to Suppress that
4       was granted and the charges against both of
5       you were dismissed, correct?
6  A.   Uh-huh.
7  Q.   You have to say yes or no.
8  A.   Yes, sir.
9  Q.   Okay. And then the federal government filed
10      charges against him and he ended up pleading
11      guilty to a charge and is serving time. Did
12      the federal government file any charges
13      against you?
14 A.   Huh-uh. No.
15 Q.   Do you know why?
16 A.   Chip Algren didn't pursue it. The state's
17      attorney, he just said, Jason, I know that
18      stuff wasn't yours, you know, basically, you
19      know.
20 Q.   But he's not the federal prosecutor. The
21      federal prosecutor made that decision.
22 A.   Yeah. Yeah. Because they knew whose stuff
23      it was, you know.
24 Q.   So I'm going to have a bunch of specific

6

1       questions for you, but why don't we just
2       start off with you just telling me what
3       happened, it would have been June 21, 2005,
4       at approximately what, 2:35 a.m.
5  A.   Yes, sir.
6  Q.   Why don't you go ahead and tell us what
7       happened.
8  A.   Douglas Corsaro pulled us over and he come
9       up to the vehicle and he was getting cute
10      from the beginning because he don't like me,
11      for one, because I'm dating his
12      ex-girlfriend. So just made matters even
13      worse.
14 Q.   Who's that?
15 A.   Angie Brunswick.
16 Q.   Okay. Go ahead.
17 A.   And he stated, he said exact words, he
18      stated, he said, So, Mr. Mettler, how are
19      you and Ms. Brunswick?
20           And I said, I told him, Well,
21      that's none of your business. I said, What
22      did you pull us over for?
23           He said something about a
24      taillight or a brake light -- or license

7

1       plate light being out.
2  Q.   Okay. And the vehicle was --
3  A.   Tillea Cooper's.
4  Q.   Can you spell her first name?
5  A.   T-E-L -- I have no idea.
6  Q.   T-I-L-L-E-A?
7  A.   Yeah.
8  Q.   And you were driving, correct?
9  A.   Yeah.
10 Q.   Why were you driving her vehicle?
11 A.   'Cause J.J., he didn't have no license,
12      Jeremiah Griffin didn't have no license.
13 Q.   Okay. Did you own a vehicle at that time?
14 A.   No.
15 Q.   But again, why were you driving her vehicle?
16 A.   Because that was J.J.'s girlfriend.
17 Q.   Got you. All right. And when was the first
18      time you drove that vehicle? On that
19      occasion?
20 A.   Yeah.
21 Q.   And do you remember when you first drove it
22      that day or night?
23 A.   It was that -- right then when we took off.
24      He drove before that, and then he said,

8

1       Well, we're going back into Monmouth, he
2       said, why don't you drive. Because we went
3       to Galesburg, and when we come back from
4       Galesburg, he said, Why don't you drive.
5  Q.   So you drove from Galesburg back to
6       Monmouth, correct?
7  A.   Yep.
8  Q.   Do you know when you left Galesburg?
9  A.   I don't remember what the time was.
10 Q.   And the state trooper and a couple officers
11      all said that the registration light was
12      out. Do you know whether it was out or not?
13 A.   I don't believe it was out.
14 Q.   Did you ever look though?
15 A.   No. He wouldn't let me out of the car
16      really.
17 Q.   So go ahead. You guys are stopped by
18      Corsaro, and then what happened?
19 A.   He started getting smart, cussing me out,
20      you know, I mean, basic stuff. When we see
21      him, he always harasses us, you know,
22      because he don't like us for one. And then
23      to make matters even worse, you know, Angie
24      broke up with him, and then me and Angie got

9

```
 1        together, so that was another checkmark
 2        against me, you know, so, I mean, I've
 3        always had problems with the Monmouth cops,
 4        you know, harassing me.
 5              He went on to say, you know, he
 6        asked me if there was any guns or knives or
 7        anything, any weapons in the car. I said,
 8        Yeah, I got a pocketknife in my pocket, and
 9        I handed it to him through the window. And
10        he states in the police reports that I got
11        out of the car and threw it on the hood.
12        He's lying. You know, there's one lie right
13        there.
14   Q.   Just tell me what happened.
15   A.   Well, I am telling you what happened. I
16        handed him the knife and then he got a
17        little smart and he said, Well, we're going
18        to call the canine in. Whatever. You know,
19        we had another dog in the car, a big Pit
20        Bull. J.J.'s dog was in the car.
21   Q.   Right.
22   A.   You know, they was all -- a couple cops was
23        all grouped around standing there laughing,
24        thinking this was funny, you know.
```

10

```
 1              Well, Terry Hepner arrived on the
 2        scene, the canine unit. He told us to roll
 3        all the windows up in the car. So we rolled
 4        all the windows up. He ran the dog. He
 5        started at the front of the vehicle -- well,
 6        no, on the back half of the vehicle on the
 7        passenger side and started around the car.
 8        When he got to the driver's back rear door,
 9        he took his flashlight, I watched him right
10        in my rear view mirror, and smacked the side
11        of the car, the dog started barking. And he
12        said, Well, that's probable cause, the dog
13        hit on the car.
14   Q.   Who struck the flashlight against the car?
15   A.   Hepner did.
16   Q.   Then what happened?
17   A.   Then they said there was probable cause to
18        search the car. We told them we wasn't
19        getting out, so they warned us to get out,
20        pulling guns on us and stuff. Then they
21        finally broke the window out and sprayed us
22        with mace.
23   Q.   Let me stop you there. Both you and Griffin
24        refused to get out?
```

11

```
 1   A.   Yeah. What was the reason, you know? I sat
 2        there and watched him tap the car and get
 3        the dog barking, and then he's going to say
 4        the dog hit on the car? No, he didn't.
 5   Q.   How much time elapsed from the moment
 6        Corsaro stopped you guys until Hepner showed
 7        up with the dog?
 8   A.   Like 45 minutes to an hour. It was awhile.
 9        That was another thing the judge was kind of
10        leaning on. He said, what's the sense of
11        keeping them guys there that long, you know,
12        when you had no reasonable suspicion or more
13        than a mere hunch to, you know. . .
14   Q.   When he told you guys to get out of the car,
15        did you start the car and try to move it?
16   A.   Yeah, I started the car, but I didn't move
17        it.
18   Q.   Then what happened?
19   A.   Then they broke the passenger side window
20        out and started spraying mace in there, so I
21        got out. And Doug Corsaro grabbed me and
22        they all took me to the ground, and Doug hit
23        me in the back of the ear with a can --
24        either it was a can of mace or flashlight
```

12

```
 1        and split my ear open.
 2              Then Terry Hepner proceeded to
 3        kick me in the back legs and in the ribs.
 4        And then Jimmy McVey punched me in my -- it
 5        was my left face twice, because about four
 6        weeks before we got arrested, he was getting
 7        smart with me. I seen him down by --
 8        there's an automotive shop down by Casey's
 9        General Store, and I said something smart to
10        him, and he said something about -- and I
11        said something about his wife, and he said,
12        I'll get you, I'll get you.
13              And then when they had me, they
14        choked me until I was almost passed out, and
15        he leaned down after he punched me in my eye
16        twice and told me, he said, That's for
17        getting smart with me that night.
18   Q.   And they cuffed you?
19   A.   Uh-huh.
20   Q.   And then what?
21   A.   And then put me in the cop car.
22   Q.   And during this whole time Griffin is still
23        in the car?
24   A.   Yeah, I guess. I couldn't see back there.
```

13

| | | |
|---|---|---|
| 1 | Q. | Then what happened? |
| 2 | A. | Took me up to the sheriff's office and |
| 3 | | booked me. |
| 4 | Q. | Well, before you left, they removed you from |
| 5 | | the scene, did they get Griffin out of the |
| 6 | | vehicle? |
| 7 | A. | Oh, yeah, I think so. |
| 8 | Q. | Okay. You don't know whether Corsaro |
| 9 | | stopped that same -- |
| 10 | A. | I guess something about -- |
| 11 | Q. | Well, let me finish my question, I'm sorry. |
| 12 | | You've got to bear with me. |
| 13 | | You don't know if Officer Corsaro |
| 14 | | stopped that same vehicle, a 2000 Pontiac |
| 15 | | Grand Am owned by a Tillea Cooper, two weeks |
| 16 | | prior to that or not; is that correct? |
| 17 | A. | No. I mean, I never recalled that. |
| 18 | Q. | That may have happened, you just don't |
| 19 | | recall? |
| 20 | A. | Yeah. |
| 21 | Q. | It may have had a registration light out, |
| 22 | | you just don't know either? |
| 23 | A. | Yeah. |
| 24 | Q. | He may have told whoever was driving that |

14

| | | |
|---|---|---|
| 1 | | vehicle two weeks earlier that the light was |
| 2 | | out, you just don't know one way or the |
| 3 | | other, correct? |
| 4 | A. | Yes. |
| 5 | Q. | And Griffin was dating Cooper, correct? |
| 6 | A. | Uh-huh. Yes. |
| 7 | Q. | Cooper didn't have a -- strike that. |
| 8 | | Griffin didn't have a driver's |
| 9 | | license? |
| 10 | A. | No. |
| 11 | Q. | Suspended? |
| 12 | A. | Yeah. I don't know what was the deal with |
| 13 | | his driver's license. |
| 14 | Q. | And you guys were stopped in the 1100 block |
| 15 | | of East Euclid, correct? |
| 16 | A. | Yes, sir. |
| 17 | Q. | And when Corsaro approached you initially, |
| 18 | | did he tell you he was stopping you because |
| 19 | | the registration light was out? |
| 20 | A. | Yeah. |
| 21 | Q. | And did you tell Corsaro at that time where |
| 22 | | you had been? |
| 23 | A. | Huh-uh. |
| 24 | Q. | Okay. Did you ever tell any of the officers |

15

| | | |
|---|---|---|
| 1 | | where you had been earlier? |
| 2 | A. | Huh-uh. |
| 3 | Q. | You have to say yes or no. |
| 4 | A. | No. |
| 5 | Q. | What were you guys doing in Galesburg? |
| 6 | A. | We went over to a friend's house and then |
| 7 | | come right back. |
| 8 | Q. | Which friend? |
| 9 | A. | I think -- with J.J. just -- Jeramiah ran in |
| 10 | | real quick. I know I stayed in the car. I |
| 11 | | don't know who it was. |
| 12 | Q. | Now, it said you had been arrested before |
| 13 | | for delivery of drugs or manufacture of |
| 14 | | methamphetamines. |
| 15 | A. | No. I been arrested for delivery of |
| 16 | | controlled substance. |
| 17 | Q. | What controlled substance? |
| 18 | A. | It was crack cocaine. |
| 19 | Q. | And that was prior to that date, correct? |
| 20 | A. | Yeah. But that was -- |
| 21 | Q. | When was that? |
| 22 | A. | When I was 18 years old. |
| 23 | Q. | And that was for delivery of crack? |
| 24 | A. | Uh-huh. |

16

| | | |
|---|---|---|
| 1 | Q. | You have to say yes or no. |
| 2 | A. | Yes, sir. |
| 3 | Q. | Any other arrests prior to June of 2005? |
| 4 | A. | I think there was unlawful delivery of |
| 5 | | cannabis. |
| 6 | Q. | Okay. And did you plead guilty or found |
| 7 | | guilty on both of those charges? |
| 8 | A. | Yeah. |
| 9 | Q. | Any other charges against you prior to June |
| 10 | | of 2005? |
| 11 | A. | Not that I can recall. |
| 12 | Q. | And had Griffin been arrested prior to June |
| 13 | | of 2005 for various drug arrests? |
| 14 | A. | Yes, he had just got arrested in Galesburg |
| 15 | | like a week or so ago with the same thing. |
| 16 | Q. | For what? |
| 17 | A. | For methamphetamine. |
| 18 | Q. | Really? You weren't with him then? |
| 19 | A. | No. |
| 20 | Q. | And you weren't there when he was arrested |
| 21 | | in Galesburg? |
| 22 | A. | Huh-uh. No. |
| 23 | Q. | Okay. He may have had those illegal drugs |
| 24 | | with him, you just don't know one way or the |

17

1   other, correct?
2   A.  Yes.
3   Q.  Griffin had been involved in the manufacture
4       of methamphetamines prior to June of 2005;
5       is that correct?
6   A.  Yes.
7   Q.  And I guess your position in the whole thing
8       is all this stuff was Jeramiah's?
9   A.  Yeah.
10  Q.  All right.  Everything that was found in the
11      car was his?
12  A.  Yeah.
13  Q.  Okay.
14  A.  Except a little bit of marijuana I had in my
15      sock.
16  Q.  There was a duffle bag in the vehicle; is
17      that correct?
18  A.  Yeah, I think so.
19  Q.  What color was that?
20  A.  I have no idea what color it was.
21  Q.  And that was Jeramiah's?
22  A.  Yes, sir.
23  Q.  Do you know what was in there?
24  A.  No.

18

1   Q.  Do you smoke cigarettes?
2   A.  Yeah.
3   Q.  Does Jeramiah, or did he then?
4   A.  Yeah.  Yeah.
5   Q.  Did you attempt to get out of the vehicle
6       and they ordered that you stay in the
7       vehicle --
8   A.  Yeah.
9   Q.  -- initially?
10  A.  Because I was going to get out and look at
11      that light, but they wouldn't let me.
12  Q.  And at that time was Jeramiah manufacturing
13      methamphetamines out on country roads?
14  A.  Yeah.
15  Q.  Was he?  I mean, while he was driving or you
16      just pull over somewhere and --
17  A.  I have no idea.
18  Q.  But he told you that, or you know it?
19  A.  Yeah.  Well, he had dope all the time, you
20      know.
21  Q.  So you think the canine alerted on the
22      driver's side rather than the passenger's
23      side of the vehicle?
24  A.  Yeah, it was the -- it was the driver's

19

1       side, back door is where he said it hit at.
2   Q.  Now, they removed eventually
3       methamphetamines and cannabis and various
4       drugs from the vehicle, correct?
5   A.  Yeah, but the dog -- as soon as he hit that
6       door with the flashlight, the dog started
7       barking.
8   Q.  I understand that.  But there were drugs in
9       the vehicle?
10  A.  Yeah.  And he's saying that the dog started
11      pawing at the vehicle.  That's totally a big
12      ass lie.
13  Q.  And you were looking at this how?
14  A.  Through -- right through the rear view
15      mirror.
16  Q.  Side mirror?
17  A.  Yeah.
18  Q.  And then he -- one of the officers told you
19      to get out of the vehicle and you refused
20      to, correct?
21  A.  Yeah.
22  Q.  Did you lock the vehicle at that time?
23  A.  Yeah.  Well, the windows were already rolled
24      up, because they told us to roll them up, so

20

1       we locked the doors.
2   Q.  And then you started the vehicle, correct?
3   A.  Uh-huh.
4   Q.  You have to say yes or no.
5   A.  Yes.
6   Q.  And then they pulled the squad car in front
7       of you?
8   A.  Yeah.
9   Q.  Prevented you from leaving?
10  A.  Yeah.
11  Q.  Did you put it in drive?
12  A.  Huh-uh.  No.
13  Q.  And then you guys were ordered to get out of
14      the vehicle, and then you refused, correct?
15  A.  Yes.
16  Q.  And then they broke out the passenger side
17      window, correct?
18  A.  Yes.
19  Q.  And they sprayed pepper spray in the
20      interior?
21  A.  Yeah.
22  Q.  Now, during this time did either you or
23      Griffin attempt to encourage the dog to
24      attack the officers, the Pit Bull?

21

1  A.  Not that I recall of. They said we did, but
2      there was -- the dog was -- jumped over my
3      lap and the leash was so tight on my
4      stomach, because he was caught by the seat
5      belt thing, and he was hanging there. They
6      was spraying the dog with mace, that's how.
7          . .
8  Q.  It was a vicious dog?
9  A.  No.
10  Q.  Wasn't? Several officers, including the
11      state police officer, said that --
12  A.  It wasn't barking or growling.
13  Q.  -- you two were --
14  A.  Griffin might have been saying something,
15      but I wasn't.
16  Q.  -- saying something that would cause the dog
17      to attack the officers.
18  A.  Yeah, but the dog was sitting there looking
19      at me.
20  Q.  And then they tried to pull you out of the
21      vehicle and you resisted; is that right?
22  A.  Uh-huh.
23  Q.  You have to say yes or no.
24  A.  Yes.

22

1  Q.  Do you recall seeing the state trooper there
2      at the time?
3  A.  Yeah. Actually, that's the one who wiped my
4      eyes out and helped me the most. And he
5      even told me it was bullshit how they
6      treated me.
7  Q.  Did you know him before that date, Elswick?
8  A.  No, no.
9  Q.  And that's E-L-S-W-I-C-K.
10          Then they found some cannabis in
11      your front pant pocket and some stuffed in
12      your socks, correct?
13  A.  There was -- there was only some in my sock.
14      I didn't have none in my pocket. I had
15      probably a joint's worth of weed in my sock.
16  Q.  So you don't know what happened with Griffin
17      then?
18  A.  No.
19  Q.  Now, there was a wallet with no I.D. in it
20      which contained a little over $1,200. Did
21      both you and Griffin both claim ownership of
22      that wallet?
23  A.  Huh-uh.
24  Q.  Whose wallet was it?

23

1  A.  It was J.J's.
2  Q.  Was there a bag in the front seat, a plastic
3      bag with marijuana in it?
4  A.  Not that I recall of.
5  Q.  You don't dispute that there was cannabis --
6  A.  Yeah, there was cannabis.
7  Q.   -- in the vehicle?
8  A.  In the car, yeah.
9  Q.  Other than what was in your sock?
10  A.  Yeah, he had it in his pocket.
11  Q.  He sold cannabis and methamphetamines at
12      that time?
13  A.  Yes.
14  Q.  Now, one of the officers said there was a
15      white powder, and it was later tested to be
16      methamphetamines, on the vehicle's key
17      chain.
18  A.  I didn't even know it was there.
19  Q.  But you -- it may have been there, you just
20      don't know?
21  A.  Yeah.
22  Q.  And there were several coffee filters with a
23      white residue on them found in the vehicle.
24      You don't dispute that?

24

1  A.  I had no idea what he had in the car. The
2      man asked me to drive the car from
3      Galesburg, and that's what I did.
4  Q.  Was it pretty common knowledge on the
5      streets before June of 2005 that Griffin was
6      manufacturing and selling methamphetamines?
7  A.  Everybody knew it.
8  Q.  Okay.
9  A.  Including the cops.
10  Q.  And he was manufacturing out on country
11      roads?
12  A.  I guess.
13  Q.  Also there was an air pump, a hair dryer,
14      and a couple glass jars in the vehicle; is
15      that correct?
16  A.  I don't -- I don't know what was in that
17      bag. Whatever was in that bag, I have not a
18      clue.
19  Q.  Did you give the officers consent to search
20      your person?
21  A.  Yeah. Well, no, they searched me after they
22      got me -- got me up and got the -- after
23      they got me handcuffed.
24  Q.  Before the dog arrived, though, Officer

## 25

```
 1        Hepner with the dog, did you authorize the
 2        officers to search your person?
 3   A.   Yeah, I told them, Search me, I ain't got
 4        nothing on me.
 5   Q.   But you did, didn't you?
 6   A.   It really wasn't, you know -- that ain't
 7        amount to nothing. I just ain't got nothing
 8        good to say about them people. They did me
 9        wrong, and, I mean, that's the bottom line.
10   Q.   Whose key chain was it?
11   A.   It was on the keys, so obviously it was
12        Tillea's or J.J.'s.
13   Q.   Did you know what was in the trunk of the
14        car?
15   A.   No.
16   Q.   You were offered federal immunity to sign a
17        statement against Griffin, correct?
18   A.   Yeah, and I went and talked to some people
19        up in Peoria.
20   Q.   Okay. So that's why you weren't charged is
21        because you gave a statement to them?
22   A.   Yeah.
23   Q.   Do you remember that?
24   A.   Yeah.
```

## 26

```
 1   Q.   You were offered federal immunity so that
 2        you could give a statement under oath
 3        against Griffin, correct?
 4   A.   Uh-huh.
 5   Q.   Is that yes?
 6   A.   Yes.
 7   Q.   Okay. Now, when the red lights came on, did
 8        Griffin panic a little bit because he had
 9        all of this, the drugs in the vehicle?
10   A.   I -- obviously -- I thought he was just
11        worried about the weed he had in his pocket.
12        I didn't know that duffle bag was in the
13        trunk, you know what I mean?
14   Q.   But when the red lights came on, was he
15        trying to hide stuff?
16   A.   He took the bag of weed and shoved it
17        underneath my seat.
18   Q.   And was he fiddling with stuff in the back
19        seat?
20   A.   In the back seat. That's when the weed got
21        shoved underneath my seat.
22   Q.   The state trooper said that during this
23        physical altercation Griffin yelled that he
24        was going to release his Pit Bull and allow
```

## 27

```
 1        it to attack the officers. Do you remember
 2        hearing that?
 3   A.   Huh-uh. I was -- I was getting sprayed with
 4        mace and beat up by a bunch of cops.
 5   Q.   Do you have any idea where Griffin's at now?
 6   A.   Yeah, he's in the federal penitentiary.
 7   Q.   In Arkansas?
 8   A.   It says on that paper. In Arkansas
 9        somewhere.
10             MR. PERKINS:  I think that's all I
11        have.
12             THE WITNESS:  All right.
13
14
15
16
17
18             FURTHER DEPONENT SAITH NOT.
19                  SIGNATURE WAIVED.
20
21
22
23
24
```

## 28

```
 1   STATE OF ILLINOIS  )
 2   COUNTY OF KNOX     )
 3
 4
 5            C E R T I F I C A T E
 6      I, Amy S. Powers, CSR, RPR, a Notary Public
 7   duly commissioned and qualified in the State of
 8   Illinois, DO HEREBY CERTIFY that pursuant to
 9   notice there came before me on the 6th day of
10   December 2006, at 250 East Main Street, Suite
11   316, in the City of Galesburg, County of Knox,
12   and State of Illinois, the following named
13   person, to wit:
14
15        JASON METTLER,
16
17   who was by me first duly sworn to testify to the
18   truth and nothing but the truth of his knowledge
19   touching and concerning the matters in
20   controversy in this cause and that he was
21   thereupon carefully examined upon his oath and
22   his examination immediately reduced to shorthand
23   by means of stenotype by me.
24      I ALSO CERTIFY that the deposition is a true
```

29

1   record of the testimony given by the witness and
2   that the necessity of calling the court reporter
3   at time of trial for the purpose of
4   authenticating said transcript was also waived.
5       I FURTHER CERTIFY THAT I am neither attorney
6   or counsel for, nor related to or employed by,
7   any of the parties to the action in which this
8   deposition is taken, and further, that I am not a
9   relative or employee of any attorney or counsel
10  employed by the parties hereto, or financially
11  interested in the action.
12      IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal at Galesburg,
14  Illinois, this 21st day of December 2006.
15
16
17                  AMY S. POWERS
18                  Certified Shorthand
                    Reporter
19
20
21
22
23
24

E-FILED
Friday, 04 May, 2006 11:13:49 AM
Clerk, U.S. District Court, ILCD



# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### AT ROCK ISLAND

**FILED**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | APR 2 6 2006 |
| ) |  |
| Plaintiff, ) | JOHN M. WATERS, Clerk |
| ) | U.S. DISTRICT COURT |
| v. ) | CENTRAL DISTRICT OF ILLINOIS |
| ) | Case No. 06-40001 |
| JEREMIAH JAMES GRIFFIN, ) |  |
| ) |  |
| Defendant. ) |  |

## COOPERATION PLEA AGREEMENT AND STIPULATION OF FACTS

Pursuant to Rule 11(c) of the Federal Rules of Criminal Procedure, including Rule 11(c)(1)(C),[1] the United States of America, by Rodger A. Heaton, United States Attorney for the Central District of Illinois, and Jeffrey B. Lang, Assistant United States Attorney, and the defendant, Jeremiah James Griffin, personally and by the defendant's attorney, George F. Taseff, hereby enter into this plea agreement.

1. This document contains the complete and only plea agreement between the United States Attorney for the Central District of Illinois and the defendant. This agreement supersedes and replaces any and all prior formal and informal, written and oral, express and implied, agreements between the parties, including plea agreements. No other agreement, understanding, promise, or condition between the

---

[1]Paragraph 12 on Page 7 of this Plea Agreement contains a Rule 11(c)(1)(C) component.

**EXHIBIT**

C

United States Attorney for the Central District of Illinois and the defendant exists, except as set forth in this plea agreement.

2. This plea agreement is binding only upon the United States Attorney for the Central District of Illinois and the defendant. It does not bind any United States Attorney outside the Central District of Illinois, nor does it bind any state or local prosecutor. In addition, the plea agreement does not bind the Tax Division of the United States Department of Justice or the Internal Revenue Service of the United States Department of the Treasury.

3. This agreement is made pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure, and, where specified below, under Rule 11(c)(1)(C). Therefore, if the Court does not accept the recommendations of the parties, the defendant does not have the right to withdraw his plea of guilty, except in relation to the Rule 11(c)(1)(C) component specifically identified below.

## CHARGE, ELEMENTS, AND PENALTIES

4. The defendant will plead guilty to one allegation contained within Count One of the Indictment, namely, the conspiracy to possess with intent to distribute methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846.

5. The defendant has read the charge to which the defendant is pleading guilty, and the charge has been explained to the defendant by the defendant's

- 2 -

attorney. Furthermore, the defendant fully understands the nature and elements of the crime to which the defendant is pleading guilty. To sustain the charge contained in Count One of the Indictment, the United States must prove the following propositions beyond a reasonable doubt:

**COUNT ONE**
**CONSPIRACY TO POSSESS WITH INTENT TO**
**DISTRIBUTE METHAMPHETAMINE**
**21 U.S.C. § 846**

First, that the conspiracy to possess with intent to distribute a substance containing a detectable amount of methamphetamine, as charged in Count One of the Indictment, existed; and

Second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy.

6. The defendant understands and agrees that the offense to which he shall plead guilty carries the following potential penalties:

**POTENTIAL PENALTIES – COUNT ONE**

- no mandatory minimum term of imprisonment and a maximum of twenty (20) years in prison;

- a maximum fine of $1 million;

- at least three (3) years of supervised release and a maximum of a life term of supervised release; and

- a $100 mandatory special assessment.

The defendant further understands and agrees that if the defendant has a prior felony drug conviction, Count One carries no mandatory minimum term of imprisonment and a maximum of thirty (30) years in prison; a maximum fine of $2 million; at least six (6) years of supervised release and a maximum of a life term of supervised release; and a $100 special assessment.

7.  The defendant further understands that upon violation of any of the terms of the defendant's supervised release, the supervised release may be revoked and the defendant may be imprisoned for all or part of the supervised release period without credit for time previously served.

8.  The defendant understands and agrees that the Court may be required to order the defendant to pay restitution. The parties to this agreement have not reached a determination on the issue of restitution. Restitution may include the cost of incarceration and supervision. The parties acknowledge that the Court may order restitution in whatever amount it deems proper.

## STATUTORY AND APPEAL WAIVERS

### Notice of Prior Drug Conviction

9.  The defendant expressly waives any right the defendant has pursuant to Title 21, United States Code, Section 851 to require the United States Attorney's Office to file and serve an information stating in writing the prior felony drug convictions that support any enhanced sentence.

- 4 -

## Waiver of Right of Appeal from Conviction and Sentence

10. The defendant is aware that federal law, specifically, Title 28, United States Code, Section 1291, affords a defendant a right to appeal a final decision of the district court and that federal law, specifically, Title 18, United States Code, Section 3742, affords a defendant a right to appeal the conviction and/or sentence imposed. Understanding those rights, and having thoroughly discussed those rights with the defendant's attorney, the defendant knowingly and voluntarily waives the right to appeal any and all issues relating to this plea agreement and conviction and to the sentence, including any fine or restitution, within the maximum provided in the statutes of conviction, and the manner in which the sentence, including any fine or restitution, was determined, on any ground whatever, in exchange for the concessions made by the United States in this plea agreement, unless otherwise stated in this paragraph.

## Waiver of Right to Collateral Attack

11. The defendant also understands that he has a right to attack the conviction and/or sentence imposed collaterally on the grounds that it was imposed in violation of the Constitution or laws of the United States; that he received ineffective assistance from his attorney; that the Court was without proper jurisdiction; or that the conviction and/or sentence were otherwise subject to collateral attack. The defendant understands such an attack is usually brought through a motion pursuant

to Title 28, United States Code, Section 2255. The defendant and the defendant's attorney have reviewed Section 2255, and the defendant understands his rights under the statute. Understanding those rights, and having thoroughly discussed those rights with the defendant's attorney, the defendant knowingly and voluntarily waives his right to collaterally attack the conviction and/or sentence. The defendant's attorney has fully discussed and explained the defendant's right to attack the conviction and/or sentence collaterally with the defendant. The defendant specifically acknowledges that the decision to waive the right to challenge any later claim of the ineffectiveness of the defendant's counsel was made by the defendant alone notwithstanding any advice the defendant may or may not have received from the defendant's attorney regarding this right. Regardless of any advice the defendant's attorney may have given the defendant, in exchange for the concessions made by the United States in this plea agreement, the defendant hereby knowingly and voluntarily waives his right to collaterally attack the conviction and/or sentence. The rights waived by the defendant include his right to challenge the amount of any fine or restitution, in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255.

- 6 -

## SENTENCING AGREEMENT UNDER RULE 11(c)(1)(C)

12.   The parties agree and stipulate pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure[2] that the appropriate term of imprisonment to be imposed upon the defendant in this case is 84 months (seven years).

## ADVISORY SENTENCING GUIDELINES

13.   The defendant understands that the Court will calculate the defendant's offense level and criminal history category under the United States Sentencing Guidelines, and that the Court will use those calculations to arrive at an advisory sentencing range under the Guidelines. The defendant understands that the Court must consider the advisory Sentencing Guideline range when imposing sentence. The Court shall also consider the other factors listed under Title 18, United States Code, Section 3553(a) in determining the specific sentence to be imposed. The defendant understands that although the Sentencing Guidelines are advisory, the Court may, to the extent consistent with the Rule 11(c)(1)(C) agreement contained in Paragraph 12 above, choose to impose a sentence in accordance with the Sentencing Guidelines.

---

[2]Rule 11(c)(1)(C) provides, in relevant part, that "[i]f the defendant pleads guilty . . . to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will . . . agree that a specific sentence or sentencing range is the appropriate disposition of the case . . . (such a recommendation or request binds the court once the court accepts the plea agreement)."

- 7 -

14.  Based on the information currently available, the defendant and the United States agree on the following points regarding the application of the Sentencing Guidelines to the offense to which the defendant is pleading guilty:

a.  The parties agree, based upon facts currently known by the United States, that the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for the defendant's criminal conduct in accordance with Section 3E1.1 of the Sentencing Guidelines and, therefore, a two-level reduction in the offense level is appropriate.  Acceptance of personal responsibility shall include cooperating fully with the United States Probation Office in the preparation of a presentence report and not committing any bond violations while on pretrial release, including but not limited to the commission of any local, state or federal offenses.  This agreement does not preclude the United States from changing its position if new evidence to the contrary is discovered or if the defendant later demonstrates a lack of acceptance of personal responsibility for the defendant's criminal conduct.

b.    The parties also agree that the defendant qualifies for an additional one level reduction in the defendant's offense level pursuant to United States Sentencing Guidelines Section 3E1.1(b)(2) because the defendant timely notified the United States Attorney's Office of the defendant's intention to enter a

plea of guilty, thereby permitting the United States to avoid trial preparation and permitting the Court to allocate its resources efficiently.

15.    The defendant and the United States agree that the above statements regarding Sentencing Guidelines calculations are not binding on the Court, and relate only to the positions the parties take regarding the applicable advisory Sentencing Guideline range based upon the information of which they are currently aware. The Court will remain free to make its own independent determination of the applicable advisory Sentencing Guideline range.

16.    The defendant agrees that at the time of sentencing, the Court will not be bound by any recommendation made by any party, except for the Rule 11(c)(1)(C) agreement contained in Paragraph 12 above. The defendant agrees and understands that the Court will be free to impose whatever sentence it deems appropriate up to the statutory maximum, so long as the sentence is consistent with the Rule 11(c)(1)(C) agreement contained in Paragraph 12 above. The defendant agrees and understands that the defendant will not be allowed to withdraw the defendant's guilty plea because of an objection to the calculation of the Sentencing Guidelines or to the Court's sentencing findings or rulings, with the exception of a decision by the Court not to comply with the Rule 11(c)(1)(C) component of this Plea Agreement set forth in Paragraph 12 above.

17.    The United States reserves the right, in its sole discretion, to make a motion at the time of sentencing for a downward departure from the advisory Sentencing Guideline range pursuant to United States Sentencing Guidelines Section 5K1.1, if the defendant provides substantial assistance in the investigation or prosecution of other criminal offenses.  The extent of any such recommended departure will depend solely upon the United States' evaluation of the nature, extent, and value of the defendant's assistance, including the defendant's truthfulness.

## DEFENDANT'S OBLIGATIONS

### Cooperation

18. As a condition of this entire plea agreement, the defendant will cooperate fully with law enforcement officials in the investigation and prosecution of other individuals involved in drug crimes and related matters, in accordance with the following terms:

a. The defendant agrees, as a condition to this entire plea agreement, that he will cooperate fully with law enforcement officials concerning their investigation of other persons involved in drug crimes and other offenses.  The defendant specifically agrees that he will provide complete and truthful testimony to any federal grand jury, petit jury, or court before which he is called to testify.

- 10 -

b.  The United States agrees that if the defendant complies with all of the terms of the plea agreement, it will not use the statements and testimony of the defendant, either directly or indirectly, to bring additional criminal charges against the defendant.

c.  The defendant acknowledges and fully understands that if he should fail to give complete and truthful information and testimony when required by the United States Attorney, then this plea agreement shall be null and void.  The defendant acknowledges and fully understands that in such event the United States may institute criminal charges and seek full punishment against the defendant for all offenses known to the government, including but not limited to the charges set forth in the Indictment, and the government may use the statements and testimony of the defendant given pursuant to this agreement to support those charges.

d.  The defendant specifically acknowledges and understands that he is subject to prosecution and full punishment for the offense of perjury should he give false testimony to any grand jury, petit jury, in any forfeiture proceeding, or in any court hearing, and any statement and testimony made by the defendant may be used in such a prosecution.

e.  Pursuant to Section 1B1.8 of the United States Sentencing Guidelines and Policy Statements, the United States Attorney for the Central District of Illinois

- 11 -

agrees that any self-incriminating information provided by the defendant pursuant to his cooperation will not be used against him to determine the guideline range. This agreement shall not restrict the use of such information (1) known to the government prior to entering into this cooperation agreement; (2) in a prosecution for perjury or giving a false statement; or (3) in the event there is a breach of the cooperation agreement. This agreement also does not prevent the United States Attorney from using information received from any entirely independent source, meaning a source not developed through either direct or indirect use of the defendant's cooperation. While self-incriminating information provided under this agreement may not be used to determine the guideline range, it may be used (1) to determine whether and to what extent the court will depart pursuant to a motion brought under Title 18, United States Code, Section 3553(e), Section 5K1.1 of the Sentencing Guidelines, or Rule 35 of the Federal Rules of Criminal Procedure; and (2) to determine security and custody levels at the Bureau of Prisons. The United States Attorney will fully apprise the court and the United States Probation Office of the nature, extent, and value of the defendant's cooperation, and will provide to the Probation Office all reports of the defendant's statements made pursuant to this agreement. Accordingly, although self-incriminating information obtained from the defendant pursuant to his cooperation may not be used to calculate his guideline

range, it may be included as background information in the defendant's presentence report.

19. The defendant agrees to waive and waives any rights the defendant may have under the Speedy Trial Act, and the defendant understands that his sentencing may be delayed until his cooperation has been completed so that at sentencing the court will have the benefit of all relevant information.

20. The defendant and his attorney acknowledge that they have reviewed, and the defendant understands, the possible application of United States Sentencing Guidelines Section 5K1.1. They further acknowledge, consistent with Application Note 3 to that Section, that the United States is in the best position to assess the value of the defendant's cooperation to the United States and its law enforcement efforts. In return for receiving the opportunity to cooperate with the government and for the opportunity to be considered by the government for a motion and recommendation for a downward departure pursuant to Section 5K1.1, the defendant and his attorney agree to limit any argument regarding the extent of a downward departure for substantial assistance to the government to only those grounds specifically set forth in Section 5K1.1 and its application notes.

### Special Assessment

21. The defendant further understands and agrees to pay the mandatory $100 Special Assessment for the count of the Indictment to which the defendant is

entering a plea of guilty, as required under Title 18, United States Code, Section 3013. The defendant agrees to pay this mandatory special assessment at the time of sentencing by delivering a check or money order made payable to the United States District Court and understands that he will be required to do so as a condition of this plea agreement. The failure to comply with this requirement, however, will not constitute grounds for the defendant to withdraw any plea of guilty.

## THE UNITED STATES ATTORNEY'S OBLIGATIONS

22. At the time of sentencing, the United States agrees that it will move to dismiss the remaining count of the Indictment, namely Count Two, which charges the defendant with the possession with intent to distribute methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C). The defendant acknowledges that the count that the United States agrees to dismiss was brought in good faith and not for any vexatious or frivolous reason on the part of the United States.

23. The United States Attorney for the Central District of Illinois agrees to bring no additional criminal charges in the Central District of Illinois against the defendant relating to or arising from the offenses charged in the Indictment, except for any crime of violence and any crime unknown to the United States Attorney for the Central District of Illinois prior to the time this plea agreement is signed by the parties.

24. The United States agrees that at the time of sentencing it will fully inform the Court of the nature, extent, and value of any cooperation rendered by the defendant.

## FACTUAL BASIS

25.    The defendant will plead guilty because the defendant is in fact guilty of Count One contained in the Indictment.  In pleading guilty to the charge, the defendant stipulates to and admits to the following facts:

a.  On and before June 21, 2005, the defendant and other individuals endeavored together to obtain methamphetamine, which was to be distributed in Warren County, Illinois, and elsewhere.  The defendant's conduct included the buying and selling of methamphetamine, as well as personally participating in the illicit manufacturing of methamphetamine.

b.  As one example of such conduct, during the early morning hours of June 21, 2005, the defendant had a bag in an automobile in which he was a passenger when the vehicle was stopped by an officer of the Monmouth Police Department.  The bag had in it two jars containing about 878 grams of liquid by-product from the clandestine manufacturing of methamphetamine.  Despite being a by-product, the liquid contained some small amount of methamphetamine, as was subsequently determined by the Drug Enforcement Administration Laboratory.  Other items in the bag and the vehicle included equipment for the manufacturing

- 15 -

of methamphetamine, such as a hair dryer, assorted tools, coffee filters, a spatula, and an aquarium blower. In addition, small amounts of finished methamphetamine powder were located elsewhere in the vehicle.

c. The defendant had been involved in obtaining methamphetamine for distribution for approximately two years prior to his arrest on June 21, 2005.

d. The defendant knew that his conduct with methamphetamine as described above was against the law.

## EFFECT OF VIOLATION OF AGREEMENT

26.    The defendant further agrees that if the defendant violates the terms of this plea agreement the United States has the option to declare the plea agreement null and void. In the event the United States exercises its option to declare the plea agreement null and void, the United States will be completely released from all of its obligations under this plea agreement and the United States will be free to seek to vacate the defendant's conviction and/sentence, and to reinstate any previously dismissed charges against the defendant or to seek the defendant's resentencing. However, in the event the United States exercises its option to declare the plea agreement null and void, the defendant will not be allowed to withdraw from any previously accepted guilty plea. The defendant also agrees to waive any and all double jeopardy rights, and the applicable statute of limitations should the United

States seek to reinstate any charges against the defendant or seek to have the defendant resentenced.

27.    Whether or not the defendant has violated the terms of the plea agreement shall be determined by the Court. The burden of proof shall rest with the United States to establish by a preponderance of the evidence that the defendant violated the terms of the plea agreement.

## WAIVER OF CONSTITUTIONAL RIGHTS

28.    The defendant understands that by pleading guilty the defendant surrenders the following rights among others:

a.    The right to plead not guilty or persist in the plea of not guilty if already made. If the defendant persisted in a plea of not guilty to the charge the defendant would have the right to a public and speedy trial.

b.    The right to a trial by jury. The defendant has an absolute right to a jury trial. The jury would be composed of twelve persons selected at random. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that the defendant is presumed innocent, and that it could not convict the defendant unless, after hearing all the evidence, it was persuaded that the United States had met its burden of proving the defendant guilty beyond a reasonable doubt. The defendant could also ask for a trial by the Judge instead of a trial by a jury.

- 17 -

c.    The right to the assistance of counsel. The defendant has the right to be represented by an attorney at every stage of the proceedings and, if the court finds the defendant is unable to afford an attorney, one will be appointed to represent the defendant at no cost to the defendant.

d.    The right to confront and cross-examine adverse witnesses. At a trial, the United States would be required to present its witnesses and other evidence against the defendant. The defendant would be able to see and hear those government witnesses and the defendant's attorney would be able to cross-examine them. In turn, the defendant's counsel could present witnesses and other evidence on the defendant's behalf. If the witnesses for the defendant refused to appear voluntarily, their attendance could be required through the subpoena power of the court.

e.    The right against compelled self-incrimination. At a trial, the defendant would have a privilege against self-incrimination so that the defendant could decline to testify, and no inference of guilt could be drawn from the defendant's refusal to testify. If the defendant desired to do so, the defendant could testify on the defendant's own behalf.

29.    The defendant understands that by pleading guilty the defendant is waiving all the rights set forth in the prior paragraphs. The defendant's attorney has explained those rights to the defendant and the consequences of the waiver of those rights.

- 18 -

## AGREED:

**Defendant's Attorney:**

30.    I have discussed this plea agreement fully with my client, and I am satisfied that my client fully understands its contents and terms.  No threats, promises, or representations have been made, nor agreements reached, express or implied, to induce my client to plead guilty other than those stated in this written Plea Agreement.  I have reviewed with my client United States Sentencing Guidelines Sections 1B1.3 and 1B1.4 (relevant conduct).


Date: ___4-26-06___          S/George Taseff
                              _____
                              George F. Taseff
                              Attorney for Jeremiah James Griffin

**Defendant:**

31.    I have read this entire Plea Agreement carefully and have discussed it fully with my attorney.  I fully understand this Agreement, and I agree to it voluntarily and of my own free will.  I am pleading guilty because I am in fact guilty, and I agree that the facts stated in this Agreement about my criminal conduct are true.  No threats, promises, or commitments have been made to me or to anyone else, and no agreements have been reached, expressed or implied, to influence me to plead guilty other than those stated in this written Plea Agreement.  I am satisfied

with the legal services provided by my attorney. I understand that by signing below I am stating I agree with everything stated in this paragraph, and I am accepting and entering into this Plea Agreement.

Date: 4/26/06

S/Jeremiah Griffin

Jeremiah James Griffin,
Defendant

**United States:**

32.    On behalf of the United States of America, I accept and agree to this Plea Agreement.

Date: 4/26/06

RODGER A. HEATON
United States Attorney

S/Jeffrey B. Lang

JEFFREY B. LANG
Assistant United States Attorney

- 20 -

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| JERAMIAH J. GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 06-4051 |
| vs. | ) | |
| | ) | |
| OFFICER DOUG CORSARO, and OFFICER | ) | |
| JIMMY MCVEY, JR., | ) | |
| | ) | |
| Defendants. | ) | |

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) ss. |
| COUNTY OF | ) |

**EXHIBIT**

D

## AFFIDAVIT OF DOUGLAS CORSARO

I, **DOUGLAS CORSARO**, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, and that I am competent to testify to the following:

1.     I have been employed by the Monmouth Police Department as a patrol officer from 4/10/96 to the present.

2.     Prior to 6/21/05, I obtained information from numerous sources that Jeramiah Griffin had been using cannabis and methamphetamines and Griffin had also been involved in the manufacture and distribution of methamphetamine.

3.     On or about 5/4/05 I reviewed a Monmouth Police report which was drafted by Officer Randy Ewing regarding Case No. 05-05-686. Officer Ewing indicated in his Monmouth Police report that he was dispatched to 114 N. 5th Street in Monmouth, Illinois regarding a potential domestic battery in progress. Officer Ewing indicated in this report that he spoke with Jeramiah Griffin's girlfriend, Ashley Hoopes. Hoopes told Officer Ewing that she went to that particular residence to retrieve Jeramiah Griffin because "he was a meth head" and she was trying to remove him from that environment. Hoopes stated that Griffin and others were "doing meth in the

HEYLROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

apartment".

4. On or about 5/6/05, I was advised by Officer Tory Carnes of the Galesburg Police Department that Galesburg officers stopped Jeramiah Griffin, who was operating a red 2000 Pontiac. I was further informed that the Galesburg Police Department arrested Jeramiah Griffin for possession of illicit drugs.

5. On or about 5/21/05, I met with Laura Cooper at the Monmouth Police Department. Cooper was concerned that her daughter, Tilliea Cooper, was involved with Jeramiah Griffin who had been using and manufacturing methamphetamines. Cooper advised that Griffin cooked his methamphetamines near Crybaby Bridge and near Warren School located in Monmouth, Illinois.

6. Prior to 6/21/05, I was told that Jeramiah Griffin typically stored products to manufacture methamphetamines in a duffle bag.

7. On 6/21/05 I was on patrol in the 200th Avenue in Monmouth, Illinois near North 14th Street. At that time I observed a red Pontiac Grand Am. The rear registration light on the vehicle was not operating. I therefore maneuvered my squad car behind the Pontiac and ran the registration through our computer system. The computer data indicated that the vehicle was registered to Tilliea Cooper. I conducted a traffic stop on the vehicle in the 11th block of East Euclid Avenue in Monmouth, Illinois on 6/21/05 at approximately 2:35 a.m. I found that the driver of the vehicle was Jason Mettler and that the passenger was Jeramiah Griffin. I advised Mettler as to the reason for the traffic stop. I knew at that time that the driver, Jason Mettler, had been arrested on previous occasions by Monmouth Police Department for delivery of drugs. I also had information that I acquired prior to that date that Mettler had been involved in the manufacture of methamphetamines. I was also aware that Griffin had been arrested in the City of Galesburg for possession of drugs and possession of equipment to manufacture methamphetamines. I had also received information prior to that date from several subjects, including Jeramiah Griffin's ex-girlfriend, Ashley Hoopes, that Griffin had been involved in the manufacture of methamphetamines. I had additionally been advised prior to 6/21/05 that Griffin transported his methamphetamine manufacturing materials in a duffle bag. During the vehicle stop on 6/21/05 I noted that there was a duffle bag in the back seat of the red Pontiac Grand Am. While conversing with Jason Mettler, Mettler appeared visibly nervous. I then

HEYL ROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

noticed that the tires on the red Pontiac Grand Am were dirty, consistent with the vehicle traveling on gravel roads. I had received information, prior to 6/21/05, that Jeramiah Griffin had a practice of traveling on rural roads and manufacturing liquid methamphetamine at various rural locations. During the car stop I observed Jeramiah Griffin attempt to reach into the backseat area of the car. Griffin's actions caused me to be suspicious that he was attempting to conceal something in the backseat of the vehicle.

During the traffic stop I notified Monmouth Police Department dispatch to call out the Monmouth Canine Unit. On 6/21/05 at 0247 hours Officer Hepner arrived at the scene. Officer Hepner walked his canine (Gino) around the Pontiac. Gino alerted on the driver's side rear door. Officer Hepner advised that Gino alerted and officers had authority to search the vehicle. Both Mettler and Griffin refused to exit the vehicle. Mettler then started the vehicle, which allowed us to conclude that he was about to flee the scene. Jason Mettler and Jeramiah Griffin were then physically removed from the vehicle. I was assisted by Illinois State Police Trooper Elswick and Monmouth Officer Jimmy McVey. During the vehicle stop Jeramiah Griffin's pitbull was in the Pontiac Grand Am. While attempting to physically remove Mettler and Griffin from the vehicle, Griffin and Mettler repeatedly encouraged the dog to attack the police officers at the scene. After Mettler and Griffin were handcuffed, officers located a small amount of cannabis in Mettler's front pants pocket. Officer Hepner and other Monmouth Police Department officers advised me that there was a methamphetamine lab contained inside the Pontiac Grand Am. Various methamphetamine manufacturing items were found, including an air pump, a hair dryer, two glass jars, and coffee filters. Also found within the vehicle was a large glass jar which tested positive for methamphetamine.

8.    On 6/21/05, the red 2000 Pontiac Grand Am was searched incident to arrest and pursuant to our departmental policy to conduct inventory searches of vehicles.

HEYL ROYSTER
VOELKER
& ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

AFFIANT FURTHER SAYETH NOT.

_Douglas S. Corsaro_
DOUGLAS CORSARO

SUBSCRIBED and SWORN to before me this __3__ day of _May 2007_

2007.

OFFICIAL SEAL
JULIE RICHARDSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-25-2007

_____
Notary Public

HEYL ROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

E-FILED
Friday, 04 May, 2007  11:20:08 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JERAMIAH J. GRIFFIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO. 06-4051 |
| vs. | ) |
| | ) |
| OFFICER DOUG CORSARO, and OFFICER | ) |
| JIMMY MCVEY, JR., | ) |
| | ) |
| Defendants. | ) |

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) ss. |
| COUNTY OF | ) |

EXHIBIT
E

## AFFIDAVIT OF JIMMY MCVEY, JR.

I, **JIMMY MCVEY, JR.,** being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, and that I am competent to testify to the following:

1.      I have been employed as a police officer with the Monmouth, Illinois Police Department from June 2000 to the present.

2.      On 6/21/05 at approximately 2:35 a.m., I was asked to assist Officer Corsaro with a traffic stop in the 11th block of East Euclid Avenue in Monmouth, Illinois. I approached the passenger side of a red Pontiac and identified the front seat passenger as Jeramiah Griffin. I also identified the driver as Jason Mettler. I noticed that Griffin's pitbull (dog) was in the back seat. I was familiar with Griffin and Mettler from several prior contacts. While Officer Corsaro was talking with the driver, Jason Mettler, I shined my flashlight in the interior of the vehicle. At that time, Jeramiah Griffin grabbed a CD case and stated "motherfucker, you want to look, I have nothing". Griffin then stated "you fuckers are not searching this car, you have no right". Griffin made that statement even though no one had made a request to search the car. During these conversations I observed the Griffin continually placed his left hand in the area

HEYL ROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

of the back seat. I cautioned Griffin on several occasions to keep his hands where I could see them. I then heard Officer Corsaro advise that he was going to call out the canine unit. After Officer Corsaro made that statement I observed the driver, Jason Mettler, attempt to hide something, which was later identified as a key chain. Officer Hepner, the canine officer, eventually arrived at the scene. Officer Hepner advised the other officers at the scene that his canine, Gino, had alerted on the driver's side passenger door. Officer Corsaro then ordered Mettler out of the vehicle. Mettler and Griffin both refused to exit the vehicle. Both were forcibly removed and placed in handcuffs. While Officer Corsaro and State Trooper Elswick were attempting to remove Mettler from the vehicle, Griffin reached into the area behind the driver's seat with his left hand. I ordered Griffin to keep his hands visible. I could not tell completely what Griffin was doing behind the seat because of the dark tint on the windows. After Mettler and Griffin were handcuffed and secured, we began to search the interior of the vehicle. I found a back pack in the backseat and searched it. I found drugs and contraband inside the back pack.

    3.     On 6/21/05, the red 2000 Pontiac Grand Am was searched incident to arrest and pursuant to our departmental policy to conduct inventory searches of vehicles.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

AFFIANT FURTHER SAYETH NOT.

_____
JIMMY McVEY, JR.

SUBSCRIBED and SWORN to before me this __3__ day of _May 2007_,

2007.

```
OFFICIAL SEAL
JULIE RICHARDSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-25-2007
```

_____
Notary Public

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

**E-FILED**
Friday, 04 May, 2007  11:20:17 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JERAMIAH J. GRIFFIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO. 06-4051 |
| vs. | ) |
| | ) |
| OFFICER DOUG CORSARO, and OFFICER | ) |
| JIMMY MCVEY, JR., | ) |
| | ) |
| Defendants. | ) |

STATE OF ILLINOIS    )
                     ) ss.
COUNTY OF            )

## AFFIDAVIT OF TERRY HEPNER

I, **TERRY HEPNER**, being first duly sworn upon oath, state that I have personal knowledge of the facts set forth herein, and that I am competent to testify to the following:

1.    I have been employed by the Monmouth Police Department as a patrol officer from March 1997 to the present.

2.    On Tuesday, 6/21/05, I was called out to assist Officer Douglas Corsaro on a traffic stop that he had made near the 11th block of East Euclid Avenue in Monmouth, Illinois. Upon arrival, at 2:47 a.m., I directed my canine, Gino, to sniff around the vehicle. Gino alerted on the rear driver's side door. I advised Officer Corsaro and Officer McVey that Gino alerted on the vehicle. Gino has been trained to alert when there is a presence of illicit drugs. Gino has demonstrated on numerous prior occasions that he is a reliable indicator of the presence of illicit drugs. After I notified Officer Corsaro and Officer McVey that Gino indicated the presence of illicit drugs in the vehicle, Officer Corsaro and Officer McVey directed Jason Mettler and Jeramiah Griffin to exit the vehicle. Griffin and Mettler refused and were later physically removed from the vehicle.

HEYL ROYSTER
VOELKER
& ALLEN

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

EXHIBIT
F

AFFIANT FURTHER SAYETH NOT.

TERRY HEPNER

SUBSCRIBED and SWORN to before me this __3rd__ day of __May__,

2007.

OFFICIAL SEAL
JULIE RICHARDSON
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-25-2007

Notary Public

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 600
124 S.W. Adams Street
Peoria, IL 61602-1352
Fax (309) 676-3374
(309) 676-0400

E-FILED
Friday, 04 May, 2007  11:20:44 AM
Clerk, U.S. District Court, ILCD

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE CENTRAL DISTRICT OF ILLINOIS
 3              ROCK ISLAND DIVISION
 4
 5    JERAMIAH J. GRIFFIN,            :
 6              Plaintiff,            :
 7    Vs.                            :    06-4051
 8    OFFICER DOUG CORSARO, and       :
      OFFICER JIMMY McVEY, JR.,       :
 9              Defendants.           :
10
11
12         The deposition of JASON W. ELSWICK,
13    called as a witness on behalf of the Defendants, in
14    the above-entitled cause, taken before me, Donna M.
15    Hagemeyer, CSR, RPR-CP, a Notary Public in and for
16    the County of Peoria and State of Illinois,
17    Illinois License No. 084-001283, at 1600 North
18    Lafayette Street, in the City of Macomb, County of
19    McDonough and State of Illinois, on the 11th day of
20    January, A.D., 2007.
21
22
23
```

Page 2

```
 1  APPEARANCES:
 2            JOHN K. KIM, ESQ.
              Heyl, Royster, Voelker & Allen
 3            124 Southwest Adams Street
              Suite 600, Chase Building
 4            Peoria, Illinois 61602
                   For the Defendants
 5
 6
 7            * * * * *
 8          I N D E X              Page
 9  Direct Examination by Mr. Kim    3
10
11          E X H I B I T S         Page
11  Exhibit A                        46
12
13
14
15
16
17
18
19
20          EXHIBIT
21            G
22
23
```

Page 3

```
 1        JASON W. ELSWICK,
 2    being first duly sworn, deposes and
 3    says as follows, in answer to:
 4        EXAMINATION BY MR. KIM:
 5    Q. Good afternoon, Officer, my name is John
 6  Kim, and I represent the defendants in this
 7  matter.  Have you given a deposition before?
 8    A. I have.
 9    Q. So you understand the ground rules?
10    A. I may review them; it's been a while.
11    Q. If you don't understand a question I ask,
12  feel free to ask me, or if you don't hear a
13  question, go ahead and ask me.  I need a verbal
14  response yes or no, as opposed to uh-huh, unh-unh
15  or shake of a head for the court reporter.
16    A. I understand.
17    Q. Okay.  Can you please state your full
18  name for the record?
19    A. Jason W. Elswick.
20    Q. Can you spell your last name?
21    A. E-l-s-w-i-c-k.
22    Q. And what is your current position or
23  rank?
```

Page 4

```
 1    A. I'm a trooper with the Illinois State
 2  Police.
 3    Q. And what district?
 4    A. District 14.
 5    Q. And where is that headquartered?
 6    A. Macomb, Illinois.
 7    Q. Is that where we are today?
 8    A. Yes, it is.
 9    Q. How long have you been with District 14
10  of the Illinois State Police?
11    A. Five years.
12    Q. During those five years, what positions
13  have you had?
14    A. I've been a trooper.  I've also been a
15  control and arrest tactics instructor.
16    Q. What is involved in being a trooper?
17  What are your daily responsibilities?
18    A. Enforce the state criminal laws as well
19  as the motor vehicle laws.
20    Q. Does that entail going out on patrol in
21  your squad car?
22    A. Yes, it does.
23    Q. How long have you most recently served as
```

GRIFFIN VS. CORSARO          CondenseIt!™

Page 5

1  a trooper?
2      A. Five years.
3      Q. So the entire time?
4      A. Yes.
5      Q. And the other position you held was?
6      A. Just an instructor for defensive tactics.
7      Q. Within the State Police?
8      A. Within the State Police, yes.
9      Q. Prior to working --
10     A. Okay. I'm sorry, that's where you're
11  going with the next question. I was a police
12  officer in Iowa for seven years before then.
13     Q. Where in Iowa were you a police officer?
14     A. Albia's Police Department, as well as the
15  Iowa Department of Transportation.
16     Q. In the Albia Police Department, what
17  position did you hold in that department?
18     A. I was a patrol officer.
19     Q. The entire time for seven years?
20     A. For two years.
21     Q. For two years?
22     A. Yes, for the five years with Department
23  of Transportation, I was a patrolman for three

Page 6

1  years, an investigator for two.
2      Q. Could you spell the police department
3  that you were a patrolman at?
4      A. The second one? The Department of
5  Transportation?
6      Q. First one.
7      A. Albia, A-l-b-i-a.
8      Q. Is that located in Albia, Iowa?
9      A. Yes.
10     Q. With the Department of Transportation,
11  where were you based out of?
12     A. Muscatine, Iowa.
13     Q. Could you give me a brief background of
14  your education?
15     A. I have a bachelor's degree in history
16  from Iowa State University.
17     Q. Over in Ames?
18     A. Yes.
19     Q. Any postgraduate education?
20     A. No.
21     Q. Did you receive any specific training for
22  your position at Albia Police Department?
23     A. I received the basic law enforcement

Page 7

1  accreditation from, it's called ILEA, Iowa Law
2  Enforcement Academy.
3      Q. And after Albia, you went to the
4  Department of Transportation?
5      A. Yes.
6      Q. Did you receive any specific training?
7      A. No, I was already a certified officer.
8      Q. Did you have to receive any additional
9  training when you became an officer of the Illinois
10  State Police?
11     A. Yes, 26 weeks at the Illinois State
12  Police Academy.
13     Q. Have you received any continuing
14  education or training for your position as a
15  trooper?
16     A. Yes. In-service type training, which --
17  the control and arrest tactics training that I
18  talked about we do four times a year. We certify
19  with our weapons four times a year.
20     Q. Do you receive any specific annual
21  training regarding narcotics trafficking or
22  narcotics manufacture?
23     A. No, just through my experience.

Page 8

1      Q. Okay. In the five years that you have
2  served with the Illinois State Police, do you have
3  any experience or specific training with respect to
4  the arrest of individuals suspected of narcotics
5  trafficking?
6      A. Extensive, yes.
7      Q. When you are on patrol, do you patrol in
8  the squad car every day?
9      A. Yes.
10     Q. And what route or area of coverage are
11  you responsible for?
12     A. Well, we were responsible for five
13  counties in the District 14. However, generally, I
14  patrol in Warren and Henderson County.
15     Q. Now, Monmouth is in Warren County. Is
16  that correct?
17     A. That is correct.
18     Q. Do you frequently patrol in the City of
19  Monmouth?
20     A. Yes.
21     Q. On a daily basis, do you patrol within
22  the City of Monmouth?
23     A. Yes.

CondenseIt!™

---

Page 9

1   Q. Is there a specific route that you take
2 when you're in the City of Monmouth?
3   A. No.
4   Q. You patrol both state and local highways,
5 as well as local city roads?
6   A. Yes.
7   Q. Are you often called to assist the
8 Monmouth Police Department?
9   A. Yes.
10   Q. Now, when a, Monmouth Police Department
11 officers call for your assistance, who makes the
12 decision to stop?
13   A. Decision for what? Who makes --
14   Q. For different actions or for the arrest
15 or --
16   A. Who is in charge at the scene?
17   Q. Correct.
18   A. That would be the officer who stopped,
19 who initiated the stop in the first place.
20   Q. So your role there is strictly backup --
21   A. Backup, yes --
22   Q. -- or assistance?
23   A. -- assistance.

---

Page 10

1   Q. Now, directing your attention to the
2 early morning hours of June 21, 2005?
3   A. Yes.
4   Q. Do you recall making a stop in the city
5 of Monmouth?
6   A. I did not make a stop. Another officer
7 made a stop. He requested assistance and I
8 responded.
9   Q. Do you recall which officer made that
10 initial stop?
11   A. Monmouth officer, Doug Corsaro,
12 C-a-s-a-r-o.
13   Q. I think it's C-o-r-s-a-r-o, perhaps.
14       Was Officer Corsaro with anyone else?
15   A. When I arrived Officer James McVey,
16 M-c-v-e-i-g-h, was also present. He also responded
17 to the backup.
18   Q. He was in a separate vehicle?
19   A. Yes.
20   Q. What time did you receive the call for
21 assistance?
22   A. I have to check my report.
23   Q. Please do.

---

Page 11

1   A. Approximately 2:35 a.m.
2   Q. Do you happen to have an independent
3 recollection of this occurrence?
4   A. Absolutely.
5   Q. Do you recall what time Officer Corsaro
6 stopped the suspects?
7   A. I don't -- I don't know what time he
8 stopped them. I can tell you that he requested
9 assistance. If I responded at 2:35 a.m., it would
10 be within a few minutes that he requested
11 assistance.
12   Q. Do you recall where you were when he
13 requested assistance over the radio?
14   A. Yes, I was at the Warren County Sheriff's
15 office.
16   Q. Where exactly were you dispatched to
17 assist Officer Corsaro?
18   A. It was within the city limits of
19 Monmouth. It was near Euclid and 11th.
20   Q. Is that a residential area?
21   A. Yes, it is.
22   Q. In what direction does Euclid run?
23   A. Euclid runs east and west.

---

Page 12

1   Q. Was the suspects' vehicle stopped on
2 Euclid?
3   A. It was on Euclid.
4   Q. Would it have been on the north side of
5 the street or south side?
6   A. North side of the street facing west.
7   Q. What was the make and model of the
8 vehicle that was stopped?
9   A. Again I'd have to check my report.
10   Q. Please do.
11   A. Was a red Pontiac passenger car.
12   Q. Was that a two door or four door, do you
13 happen to recall?
14   A. I believe it was a 2 door.
15   Q. Was there any other traffic on the street
16 when you arrived?
17   A. No.
18   Q. When you arrived on the scene, can you
19 describe what happened?
20   A. When I arrived, I spoke with Officer
21 Corsaro, he advised me that the two persons seated
22 inside the Pontiac had made several furtive
23 movements and were verbally uncooperative with

---

Page 13

1  him.  And that is why he requested backup.
2        He also advised me that he had stopped
3  the vehicle because the Pontiac registration --
4  rear registration plate light wasn't working.
5      Q. Let's stop there and dissect that a
6  little bit.
7      A. Okay.
8      Q. Officer Corsaro relayed to you that the
9  basis for his stop was a rear registration light
10 that was not working.  Is that correct?
11     A. That is correct.
12     Q. Is that the light that illuminates the
13 rear license plate?
14     A. That is correct.
15     Q. Did you have the occurrence to observe
16 for yourself whether that registration light was
17 working?
18     A. Yes, I did and it was not working.
19     Q. Do you know if any pictures or
20 photographs were taken of that registration light?
21     A. I do not know.
22     Q. Did Officer Corsaro explain to you what
23 he meant by furtive movements?

Page 14

1      A. Yes, he said that both individuals had
2  reached into the console area of the car, as well
3  as into the back seat area of the car despite being
4  told not to.  This is a large concern for police
5  officers because of the officer safety concern.
6      Q. It's a concern for --
7      A. Weapons.
8      Q. -- possible weapons?
9      A. Could also be a concern or evidence,
10 attempting to destroy or conceal weapons, but the
11 major concern was officer safety.
12     Q. Who was -- Did Officer Corsaro relate to
13 you who was in the driver's seat?
14     A. Mettler.
15     Q. The first name?
16     A. Jason I believe.
17     Q. Do you recall who was in the passenger
18 seat?
19     A. Jeramiah Griffin, otherwise known a JJ
20 Griffin.
21     Q. Was there any other persons in the
22 vehicle?
23     A. No, not persons; there was a dog.

Page 15

1      Q. What type of dog was it?
2      A. I believe it was a pit bull.
3      Q. Do you happen to know who owned the pit
4  bull?
5      A. JJ Griffin owned the pit ball.
6      Q. Were you familiar with these individuals
7  prior to this occurrence on June 21, 2005?
8      A. Yes, I was.
9      Q. On what basis did you know Jason Mettler?
10     A. Well, both individuals, I had no
11 firsthand knowledge of myself dealing with these
12 individuals.  However, both individuals, there was
13 extensive intelligence indicating they were
14 both involved in transporting illegal narcotics.
15     Q. In terms of extensive intelligence, what
16 do you mean by that?
17     A. I believe they both had arrest records
18 for similar offenses, as well as, word of mouth
19 from officer to officer.
20     Q. Would it be fair to say that they had a
21 reputation within the law enforcement community in
22 this area for narcotics trafficking?
23     A. Yes.

Page 16

1      Q. Would that be the same for narcotics
2  manufacturing?
3      A. Yes.
4      Q. What narcotics would be involved?
5      A. Methamphetamine, cocaine, cannabis, as
6  far as their reputation goes.
7      Q. This was for both individuals, Jason
8  Mettler and JJ Griffin?
9      A. Yes.
10     Q. Had you ever arrested them before
11 yourself?
12     A. I had not arrested them before.  I had
13 encountered them while they were in the jail.  And
14 when I say encountered, I had seen them there.
15 I -- I hadn't confronted or spoke to them.
16     Q. Was that prior to this occurrence?
17     A. Prior to this occurrence.
18     Q. Did Officer McVey convey to you anything
19 upon your arrival at the scene?
20     A. Just -- Well, just that I had also
21 observed the two individuals reaching into the back
22 seat, reaching into the console, when I arrived --
23 I'm sorry, excuse me, when I arrived, I heard McVey

Page 17

1 tell both individuals, at least one, on one
2 occasion, "Keep your hands where I can see them,
3 stop moving around, keep your hands where I can see
4 them."
5    Q. When you arrived, where was Officer McVey
6 located?
7    A. He was located on the curb, the north
8 curb of the roadway, so to the right and to the
9 rear of the Pontiac.  He was observing their
10 movements.
11    Q. So he was on the passenger side?
12    A. Yeah, that is correct.
13    Q. How about the location of Officer
14 Corsaro?
15    A. Officer Corsaro was behind and to the
16 left of the Pontiac, so on the driver's side.
17    Q. In your report -- First of all, let me
18 hand this to you.
19    A. Okay.  That is a copy of the report that
20 I prepared after the incident.
21    Q. Is it a complete and accurate copy of the
22 report?
23    A. Yes, it is.

Page 18

1    Q. Can we go ahead and mark that as Exhibit
2 A?
3       Turning to page 3 of the report, which
4 is the first page of your narrative, do you happen
5 to recall observing specifically what Jason Mettler
6 was doing when you arrived?
7    A. Absolutely.  When I arrived after
8 speaking with those officers, I observed Mr.
9 Mettler reach into the center console area of the
10 Pontiac.
11    Q. Did you make any instructions or orders
12 to him verbally?
13    A. I don't remember if I did or not.
14    Q. Did you observe any movements of Jeramiah
15 Griffin?
16    A. Absolutely.  He was reaching into the
17 back seat.  It appeared to me that he was
18 reaching -- he was sticking his hand where the seat
19 comes out -- the rear seat will come out of most
20 vehicles, and there's a space between the seat and
21 the floorboard.  It appeared to me that he was
22 reaching his hand back into that space between the
23 seat and the floor.

Page 19

1    Q. Would this have been behind the seat he
2 was sitting in on the passenger side?
3    A. It would have been more in the center of
4 the rear set is where he was reaching to.
5    Q. On the floorboard?
6    A. On the floorboard, the hump where the
7 drive shaft, the drive shaft hung, do you know what
8 I'm saying?
9    Q. So was there a compartment in that center
10 floorboard?
11    A. No, it's another compartment.  The rear
12 seat in those types of cars will come out.  It's
13 just a foam padded seat.  It's kind of like between
14 a box spring and a bed.
15    Q. Okay.  Thank you.  After you arrived and
16 conferred with Officer Corsaro and McVey, what
17 happened next?
18    A. Officer Corsaro had requested the
19 Monmouth Police K9.  He called them out.  He called
20 them out, the officer's name was Terry Hepner, and
21 he eventually arrived with his canine.
22    Q. Had he already called the K9 unit by the
23 time you arrived on the scene?

Page 20

1    A. I believe so, yes.
2    Q. Do you happen to know how long it took
3 the K9 unit to arrive?
4    A. Oh, I would say within 10 minutes.
5    Q. Would it be less than five minutes?
6    A. He was there very quickly after I
7 arrived.  I can't say for sure but it was very
8 quickly.
9    Q. When Officer Hepner arrived with the
10 canine, what did he do?
11    A. He walked the -- He gave some
12 instructions to the occupants of the vehicle, and I
13 believe they complied with his instructions.  I
14 think he told them to roll the windows up.  I'm not
15 sure exactly what he told them.  And he walked the
16 dog around the vehicle.
17    Q. Are you familiar with the use of K9 units
18 in traffic stops?
19    A. Yes.
20    Q. And what happened after he, Officer
21 Hepner, walked the canine around the vehicle?
22    A. I observed the canine do what's called a
23 hit on the rear left, it would be to the rear of

Page 21

1 the driver's side door.
2    Q. And can you explain what a hit is?
3    A. The dog -- It's either called a hit or an
4 alert. And it's basically, the dog indicating that
5 he smelled something I guess. I'm not a K9
6 officer, so I can't articulate exactly what that
7 means. But to me, I do know that I observed this
8 behavior by the dog, and Officer Hepner advised
9 that it was an alert, that there was probable cause
10 to search the car.
11    Q. Officer Hepner advised the three of you
12 on scene?
13    A. Yes.
14    Q. During -- Let me back up for a second.
15 During the time that you were waiting for Officer
16 Hepner to arrive with the K9 unit, what happened
17 during that time?
18    A. The two individuals in the vehicle,
19 Mettler and Griffin, repeatedly were reaching for
20 things. Mr. Mettler here had -- there was -- he
21 was reaching, I believe he was reaching into the
22 center console.
23      There was also a key chain or some sort

Page 22

1 of object that he had, that he kept fiddling with,
2 for lack of a better term. We repeatedly, all
3 three, Officer Corsaro, myself and McVey, told them
4 to quit moving, quit reaching.
5      If I -- I don't want to say that, at
6 that time because of officer safety concerns, that
7 we probably had the -- it would have been in our
8 best interests to remove the persons from the car
9 and at least check for weapons, because of, not
10 just the fact that they were reaching in different
11 places in the vehicle, but they were not complying
12 with orders to not reach the places within the
13 vehicle.
14      We were -- Our officer safety awareness
15 was extremely heightened because we were afraid of
16 possibly a weapon being in the vehicle.
17    Q. Do you know if Officer Corsaro had any
18 prior knowledge of the criminal history of either
19 Jason Mettler or Jeramiah Griffin?
20    A. He did.
21    Q. Did Officer McVey?
22    A. He did.
23    Q. Did they convey that to you?

Page 23

1    A. They didn't need to, I already knew.
2    Q. What was the basis of their knowledge?
3    A. Of their criminal activity?
4    Q. Of your understanding that Officer
5 Corsaro and McVey knew of Jeramiah Griffin's or
6 Jason McVey's histories?
7    A. Well, it's a small police department. I
8 discussed, we routinely discuss drug trafficking
9 and people in possession of drugs when we meet at
10 the jail or we meet on traffic stops or we eat
11 dinner together. And I discussed these two
12 individuals as well as many other individuals with
13 them before.
14    Q. Now after -- Withdraw that.
15      At any time before the K9 search, the
16 dog search rather, did either Jason Mettler or
17 Jeramiah Griffin exit the vehicle?
18    A. I don't believe so.
19    Q. Do you recall if at any time whether
20 either individuals consented to a search?
21    A. I don't remember them consenting to a
22 search.
23    Q. Do you recall if prior to your arrival on

Page 24

1 the scene whether Officer Corsaro, Officer McVey
2 searched either Jason Mettler or Jeramiah Griffin?
3    A. If they did, it was not told to me. I
4 have no knowledge of that.
5    Q. Now, after the dog hit or alerted on the
6 vehicle, you mentioned that was on the rear
7 driver's side of the vehicle. Correct?
8    A. Not the rear quarter panel, but in the
9 door area.
10    Q. The rear door area?
11    A. Yes.
12    Q. What happened next?
13    A. Officer Hepner put his dog away, and the
14 officers, the other officers ordered Griffin and
15 Mettler to exit the vehicle.
16    Q. Where were you located at that time?
17    A. I was still at the rear of the vehicle.
18    Q. Okay.
19    A. The individuals refused, and the driver
20 Jason Mettler reached for the gear shift. We
21 immediately started screaming at him to stop. But
22 he put the vehicle into drive. Officer Hepner was
23 near his car. He got into his car and pulled in

Page 25

1 front of Mettler's vehicle so there was no way he
2 could proceed forward.
3    Q. Was the -- Was the suspect's vehicle
4 running at the time?
5    A. Yes, it was.
6    Q. So he didn't need to, Jason Mettler did
7 not need to turn the ignition, or the driver didn't
8 need to turn the ignition on?
9    A. At the time that -- he may have had to
10 turn the ignition on at some point, but at the time
11 that Officer Hepner parked in front of him, the
12 engine was running, he had placed it into drive.
13    Q. You personally observed Jason Mettler put
14 the gear --
15    A. Yes.
16    Q. -- into drive?
17    A. Yes, I did.
18    Q. After Officer Hepner pulled his vehicle
19 forward, what happened next?
20    A. Mettler put it back into park.  Again,
21 various commands from several officers for them to
22 exit.  They still continued to move around with
23 their hands doing things that we could not

Page 26

1 determine what they were doing.
2        Mettler exited the vehicle on the
3 driver's side and started to walk away.
4    Q. Let me ask you, were any the windows of
5 this vehicle tinted?
6    A. I don't recall.
7    Q. You were able to see inside the vehicle
8 from the location where you were?
9    A. Yes, we had spotlights and strobe lights
10 through the back window.  It was very easy to see.
11    Q. So you could see not only through the
12 back window, but you could see through the side
13 windows --
14    A. Yes --
15    Q. -- both the driver and passenger side?
16    A. -- yes.
17    Q. What happened after Jason Mettler exited
18 the vehicle?
19    A. Myself and Officer Corsaro ordered him to
20 stop.  He did not run but he walked briskly toward
21 the south side of the roadway.  We ordered him
22 several times to stop; he did not comply.  I
23 grabbed ahold of Mettler's left arm, Officer

Page 27

1 Corsaro grabbed ahold of Mettler's right arm.  We
2 again commanded him to stop, and he continued to
3 pull and swing his arm at us.  He actually struck
4 Officer Corsaro in the head at some point.
5    We both, without telling each other,
6 but we both removed our O.C. spray, which is like a
7 pepper spray, and we both sprayed Mr. Mettler here
8 in the face with the pepper spray.
9    Q. When Mr. Mettler -- Actually, you
10 mentioned that he started walking in a southerly
11 direction?
12    A. Yes.
13    Q. Were you under the impression that he was
14 trying to escape?
15    A. Yes.  Because he was walking away without
16 looking at us, and we gave him commands to stop and
17 he refused.
18    Q. What happened after you sprayed Mr.
19 Mettler?
20    A. We crossed over the southern curb of the
21 roadway so we were on grass.  And he still was
22 swinging his arm wildly at us.  As I said, he, at
23 some point he struck Officer Corsaro in the face

Page 28

1 with an elbow.
2    I tripped Mr. Mettler so that he fell
3 onto the ground, and than myself, Terry -- Officer
4 Hepner also assisted us.  We handcuffed him and
5 escorted him back to, I believe Officer Corsaro --
6 Actually, we escorted him over to my squad car.
7    I assisted him with irrigating his
8 eyes.  I had some bottled water there in my trunk,
9 I helped him wash out his eyes.  So I was away from
10 the Pontiac a few minutes helping Mr. Mettler with
11 the O.C. spray.
12    Q. In your report you noted during the
13 struggle in the grassy area, you positioned
14 Mettler's left arm into an arm bar?
15    A. Yes.
16    Q. Can you describe what that is?
17    A. When I went to trip Mr. Mettler, as I
18 said before, I had ahold of his left arm, I had my
19 right hand above his elbow and my left hand below
20 his elbow.  And this -- I let go with my left hand
21 to spray him in the face.  But then I returned my
22 hand to below his left elbow.
23    I applied some pressure to the top of

Page 29

1 his elbow and pulled -- some forward pressure to
2 the top of his elbow. And I pulled on the bottom
3 forearm area, and positioned him into an arm bar,
4 which when you place an individual in an arm bar,
5 only direction they're able to go is where you want
6 them to go, which is most likely down.
7        If they don't comply with that, there's
8 a little bit of pain, and if you apply extreme
9 force, there's a possibility that you could
10 actually snap the elbow, which was not my intent at
11 all. But I did place a foot in front of his foot,
12 put force on his elbow at the same time so he fell
13 on the grass.
14    Q. Is the arm bar procedure that you learned
15 through your training and experience as an officer?
16    A. Absolutely.
17    Q. Was this use of force appropriate, an
18 appropriate response to the level of resistance
19 that Mr. Mettler exhibited?
20    A. Absolutely. Mr. Mettler was exhibiting
21 physical resistance.
22    Q. Was he injured as a result of this
23 altercation?

Page 30

1    A. No, he was not.
2    Q. You mentioned Officer Corsaro was hit in
3 the face. Did you sustain any injuries?
4    A. I had a cut on my hand, I'm not sure how
5 I received it, but I did receive it in the struggle
6 with Mr. Mettler.
7    Q. Did either you or Officer Corsaro
8 document your injuries?
9    A. Yes, I photographed both, the swelling
10 above Corsaro's eye as well as the cut on my hand.
11 I have a digital camera that I photographed those
12 with.
13    Q. Where are these photographs located
14 today?
15    A. I have them on a disk at my residence.
16    Q. And you can provide us with copies?
17    A. Yes, I can.
18    Q. When Officer -- Excuse me, when Jason
19 Mettler exited the vehicle, do you recall anything
20 that he said?
21    A. No, I don't -- as far as when he
22 initially exited from the vehicle. I do know
23 during the struggle to subdue him, he yelled back

Page 31

1 to the car and told the other occupant to let his
2 dog go, or let his dog bite them. I have to check
3 my report. I don't know if I quoted him in my
4 report or not.
5    Q. Please do. It's not a memory test.
6    A. Mettler yelled several times for Griffin
7 to sick the dog on the officers. I do remember him
8 using the word sick.
9    Q. And what type of dog was this again?
10    A. It was a pit bull.
11    Q. So it had a propensity for violence?
12    A. Absolutely.
13    Q. Do you recall if Griffin said anything
14 during this time?
15    A. He did. I need to check my report
16 again. I don't think I quote Griffin in my report,
17 but I do remember him saying that he was going --
18 "I'm going to let the dog go," or something to
19 that effect.
20    Q. Did he, in fact, do that?
21    A. He did not. The dog did exit the vehicle
22 on the driver's side. He still had ahold of the
23 leash, it was a long leash. And the dog stood on

Page 32

1 the pavement on the driver's side of the vehicle
2 barking at us.
3    Q. What happened to that dog?
4    A. The Monmouth police officers on scene
5 contacted their animal control officer, the animal
6 control officer took custody of the dog.
7    Q. While you were attending to Jason Mettler
8 here in your squad car after the altercation --
9    A. Standing outside of my car, that's where
10 I tended to him.
11    Q. Did you have the occasion to observe what
12 was happening with Mr. Griffin in the vehicle?
13    A. Not really. I believe I heard a loud
14 noise and later discovered that Officer McVey had
15 shattered the passenger side window of the Pontiac
16 in an attempt to get Griffin to exit the vehicle.
17 I believe he refused to exit.
18    Q. Was this after Mettler had exited the
19 vehicle?
20    A. Yes.
21    Q. Did Officer McVey receive authority from
22 anyone to shatter the window?
23    A. I don't know.

Page 33

1    Q. Which window was shattered?
2    A. The front passenger window.
3    Q. Do you happen to know if Officer McVey
4  had to use any other force or spray to --
5    A. I don't -- I believe he did spray. I
6  can't say for sure, but I remember, I vaguely
7  remember that he did use O.C. spray while Griffin
8  was seated in the car.
9        And -- But I think after McVey
10  shattered the window, if he indeed did spray him
11  with O.C. spray, I believe Griffin gave up pretty
12  peacefully and laid down on the grass and allowed
13  himself to be handcuffed.
14    Q. After both Mettler and Griffin were in
15  custody, what did you and the other officers do
16  next?
17    A. Based upon the alert from the dog and the
18  an arrest of the individuals, we conducted a search
19  of the vehicle.
20    Q. What areas did you personally search?
21    A. I didn't personally search any of the
22  areas, I observed the other officers search the
23  areas.

Page 34

1    Q. What offenses did the search reveal, do
2  you recall?
3    A. I believe Corsaro, and I think Officer
4  Hepner assisted with the search also.
5    Q. What, if anything, was found in the
6  vehicle?
7    A. In the rear seat in the area that I
8  alluded to earlier between the seat and the
9  floorboard, there was a large amount of cannabis,
10  loose cannabis, not in a bag, not in packages, not
11  contained, just loose cannabis leaf. And when I
12  say a large amount, I mean large clumps of
13  cannabis.
14    Q. This was behind which seat?
15    A. It was behind -- behind the driver's seat
16  and in the center of the seat, which was consistent
17  with JJ Griffin reaching into the back seat,
18  obviously, he wouldn't be able to put it directly
19  behind him. He's putting it in the center and
20  behind the driver's side, that would be a natural
21  angle, he would be trying to hide it.
22    Q. So that was in the center of the
23  floorboard?

Page 35

1    A. Yes.
2    Q. And on the floorboard behind the driver's
3  seat?
4    A. Yes.
5    Q. What else was found in the vehicle?
6    A. There was a small container, and I
7  believe it was a part of Mettler's key chain, but
8  again, I don't recall exactly, that contained a
9  small amount of methamphetamine, or at least I
10  remember it being methamphetamine. It was a little
11  small round container that was either a hidden
12  compartment or screw top lid of some sort.
13        I believe Officer Corsaro showed it to
14  me and it had just a small amount of what I believe
15  was methamphetamine.
16    Q. That was attached to the key chain?
17    A. I think so, yes.
18    Q. Do you recall anything else that was
19  observed from this search?
20    A. At some point the officers decided to tow
21  the vehicle and inventory was conducted. And they
22  opened the trunk of the vehicle as well. Inside
23  the trunk of the vehicle they showed me I believe

Page 36

1  there was some grass -- I believe there were glass
2  jars, I can't remember exactly what the containers
3  were, but they contained a liquid substance that
4  the officers believed was probably going to be
5  liquid meth or a liquid medium that had suspended
6  methamphetamine in it.
7    Q. That was in the trunk of the vehicle?
8    A. I believe it was in the trunk of vehicle.
9    Q. Was this inventory search continued while
10  you were --
11    A. Yes.
12    Q. -- still on site --
13    A. Yes.
14    Q. -- before the car was towed?
15    A. Yes.
16    Q. Do you happen to recall if those glass
17  jars were in a bag or container of any sort?
18    A. I believe the glass jars were in a bag.
19  What comes to mind is like a gym type bag, but I
20  don't remember --
21    Q. Like a duffle bag?
22    A. Like a duffle bag, yes.
23    Q. Do you recall if there were any bags

**Page 37**

1 inside the passenger compartment of the vehicle --
2    A. Passenger part of the vehicle.
3    Q. Correct?
4    A. I don't remember.
5    Q. Were there any other law enforcement
6 officials called during, to the scene during this
7 stop and search?
8    A. I don't recall.
9    Q. After the inventory search, what
10 happened?
11    A. I photographed the injuries to myself and
12 Officer Corsaro, as well as the shattered glass on
13 the passenger side of the car. I may have
14 photographed a few other things, I'm not sure. And
15 I think I left the scene and went to the sheriff's
16 office, I don't remember.
17    Q. Did you author any other reports other
18 than what's marked as Exhibit A?
19    A. No, I did not.
20    Q. Going to --
21    A. Hold on. Unless you consider in a
22 situation like this where we assist another agency,
23 we do keep track with what they charge the

**Page 38**

1 individual with. I did what are called record copy
2 only citations, they basically mirror the
3 originating agency's citations, just a way for
4 records to keep track of what types of charges we
5 assisted with.
6        So they're assist tickets basically, so
7 I did complete several assist tickets, I don't know
8 if you consider those.
9    Q. Are they attached to the report?
10    A. They're probably not attached to the one
11 you have, but they're attached to my original, or
12 copy of my report that I maintain. So if you need
13 copies of those, I can get those for you.
14    Q. Could you describe briefly what each
15 charge was?
16    A. Here is one for Mr. Griffin for
17 possession of controlled substance, methamphetamine
18 with intent to deliver; another one for Jeramiah
19 Griffin for possession of cannabis, approximately
20 1.71 ounces. Another one for Jeramiah Griffin for
21 obstructing justice; and another one for Jeramiah
22 Griffin for aggravated assault.
23        One for Jason Mettler for possession of

**Page 39**

1 controlled substance, methamphetamine, with intent
2 to deliver; another one, Jason Mettler, possession
3 of cannabis, approximately 1.71 ounces; another one
4 for Jason Mettler, aggravated battery; another one
5 for Jason Mettler for aggravated assault; another
6 one for Jason Mettler for obstructing justice;
7 another one for Jason Mettler for resisting
8 arrest. And that would be it.
9    Q. Do you happen to recall if any weapons of
10 any sort were found in the vehicle?
11    A. I don't recall. I do indicate on the
12 face sheet of my report under the weapons section
13 for both Mettler and for Griffin, I indicate O,
14 which is other. I don't know if that would be
15 indicative of the pit bull.
16        I don't see in my report where I
17 indicated any type of knife or gun, and I would
18 have marked gun or knife on the front of the
19 vehicle (sic). So other than that, I don't know.
20    Q. On the first page of that form that you
21 just referenced, what do the initials PD stand for?
22    A. Police department. And you are referring
23 to where Miranda was given?

**Page 40**

1    Q. Correct.
2    A. As I and or -- As I nor my other state
3 police officers read Miranda Warning to these
4 subjects, I just indicated that PD, that the police
5 department was responsible for advising them of
6 their Miranda Rights.
7    Q. Did you transport either Mettler or
8 Griffin to the sheriff's department?
9    A. Did I transport them? Correct?
10    Q. Correct.
11    A. I did not.
12    Q. How did you know that the registration
13 light on the suspect's vehicle was not working?
14    A. Well, this is going to sound terrible,
15 and believe me I have a hundred percent faith in
16 the Monmouth Police Department and the officers,
17 when I assist another agency when they -- I always
18 ask what their probable cause for the stop was,
19 because I've heard too many stories about different
20 agencies backing up different agencies, then
21 getting themselves in trouble because a person's
22 rights were not observed.
23        So that's one of my rules when I back

Page 41

1  up another agency, I find out what probable cause
2  for the stop was and I verify that. Indeed on this
3  night, I did just that. That's why as I indicate
4  in my report, Doug Corsaro advised me that he
5  stopped the vehicle for an inoperable rear license
6  plate light.
7        The first thing I did was to check if
8  there was a light illuminating the plate, and there
9  was not.
10    Q. Was this car running at that time?
11    A. Yes, it was.
12    Q. Was the headlights on, any other lights
13 on the exterior of the vehicle?
14    A. Yes, they were.
15    Q. So headlights were operational?
16    A. Yes.
17    Q. Were any of the rear lights in operation?
18    A. Taillights were operational.
19    Q. This was at the same time that you did
20 not observe the registration light on?
21    A. That is correct.
22    Q. Based on your experience and training as
23 a police officer and a member of the Illinois State

Page 42

1  Police, in your opinion, what was the basis for the
2  probable cause to search the vehicle?
3     A. The alert by Officer Hepner's K9 unit was
4  the probable cause for searching the vehicle.
5  Before the probable cause occurred -- Before the
6  probable cause was discovered by the K9 alert, the
7  furtive movements made by both individuals, despite
8  repeated orders and commands and requests to stop
9  moving in the vehicle, to stop reaching for things,
10 I believe created an officer safety situation in
11 which we would have looked anyway in those same
12 locations that the drug evidence was found in the
13 vehicle, we would have looked anyway, because we
14 believe there's a possibility that those
15 individuals were reaching for weapons.
16    Q. At any time was there a weapon drawn?
17    A. Actually, I can't say for sure. If I had
18 to say, if I had to --
19    Q. If you don't remember, that's fine.
20    A. Okay. I don't remember.
21    Q. Do you recall if Officer Corsaro, Officer
22 McVey or Officer Hepner had to draw their weapon at
23 any time?

Page 43

1     A. Officer McVey drew his weapon when we
2  were struggling with Mr. Mettler because he
3  believed, he didn't point at any of the suspects,
4  but he believed that Griffin was going to release
5  the pit ball. I think he intended to shoot the pit
6  bull if it came towards us to attack. He also
7  withdrew his collapsible baton and shattered the
8  passenger side window. We all withdrew our O.C.
9  spray.
10    Q. Did he mention whether Jason Mettler
11 sustained any injuries from the altercation?
12    A. If there were, they weren't evident, at
13 least on the scene, except for the O.C. spray in
14 the eyes.
15    Q. Was an ambulance or EMT called to the
16 scene, do you recall?
17    A. I asked him if he wanted an ambulance,
18 and he refused.
19    Q. And Jeremiah Griffin didn't sustain any
20 injuries in this stop?
21    A. No, unless he did for the broken glass.
22 I don't recall whether he did or not.
23    Q. Just check my notes real quick. When

Page 44

1  Jeremiah Griffin exited the vehicle, he exited
2  peaceably, you mentioned?
3     A. Yes, after refusing to do so until the
4  window was broken, and as I said, I believe Officer
5  McVey sprayed him with O.C. spray as well. But I
6  believe after that, he exited peacefully and laid
7  down in the grass.
8     Q. Officer McVey was able to --
9     A. -- handcuff him --
10    Q. -- on his own?
11    A. -- yes.
12    Q. Do you recall any statements that
13 Jeremiah Griffin made during this occurrence?
14    A. Just repeated -- Well, he made the
15 statement about releasing the dog. But after --
16 After that, I did hear him say several times, "This
17 is bullshit," things to that effect.
18    Q. Do you recall if any cash or currency was
19 recovered from the vehicle?
20    A. I don't recall.
21    Q. Were you called to testify in any state
22 criminal proceedings against either of these
23 individuals?

Page 45

1    A. No, I was not.

2    Q. Have you given a deposition or testified
3 in this in any way related to these individuals?

4    A. No, I have not.

5    Q. And you mentioned you personally observed
6 both Jason Mettler and Jeramiah Griffin reach into
7 the center console?

8    A. Yes.

9    Q. Based on your experience, what would this
10 suggest or be indicative of?

11    A. Sometimes it's just an honest mistake
12 with a traffic violator.  After he was told, "Place
13 your hands where I can see them and do not move,"
14 repeatedly, those individuals were either reaching
15 for a weapon, trying to hide a weapon, or trying to
16 conceal or destroy evidence.

17        So they repeatedly reached into the
18 center console, as well as Griffin repeatedly
19 reached into the back seat despite being told not
20 to.

21    Q. Do you recall if anything was recovered
22 from the center console?

23    A. Well, when I say in the center console,

Page 46

1 that's what it appeared to me, that Mr. Mettler was
2 reaching to during the course of the incident.  I
3 believe -- I believed after the fact, that he was
4 reaching toward the item that concealed the
5 methamphetamine, the small -- I'm not sure, like I
6 said, I'm not sure if it was a key chain or another
7 object, but I believe that's, actually, he was
8 reaching the center console area.

9        MR. KIM:  Okay.  I think that's all I
10 have.

11        Officer, you have the opportunity to
12 review your testimony for any errors.  You can't
13 change your testimony, but any corrections.  You
14 can also waive that.

15        THE WITNESS:  I waive that.

16        (Exhibit A was marked for
17        identification.).

18

19

20

21

22

23

Page 47

1 STATE OF ILLINOIS    :

2                   : SS

3 COUNTY OF PEORIA    :

4

5        C E R T I F I C A T E

6    I, Donna M. Hagemeyer, CSR, RPR-CP, a
7 Notary Public duly commissioned and qualified in
8 and for the County of Peoria and State of Illinois,
9 DO HEREBY CERTIFY that, pursuant to notice, there
10 came before me on the 11th day of January, A.D.
11 2007, at 1600 North Lafayette Street, Macomb,
12 Illinois, the following named person, to wit:

13        JASON ELSWICK,

14 a material witness called by the Defendants who was
15 by me first duly sworn to testify to the truth and
16 nothing but the truth of his knowledge touching and
17 concerning the matters in controversy in this cause
18 and that he was thereupon carefully examined upon
19 said oath and his examination immediately reduced
20 to shorthand by means of stenotype by me.

21    I ALSO CERTIFY that the deposition is a
22 true record of the testimony given by the witness,
23 that the reading and signing of the deposition by

Page 48

1 the said witness were expressly waived, and that
2 the necessity of calling the court reporter at time
3 of trial for the purpose of authenticating said
4 transcript was also waived.

5    I FURTHER CERTIFY that I am neither
6 attorney or counsel for, nor related to or employed
7 by, any of the parties to the action in which this
8 deposition is taken, and further, that I am not a
9 relative or employee of any attorney or counsel
10 employed by the parties hereto, or financially
11 interested in the action.

12    IN WITNESS WHEREOF, I have hereunto set
13 my hand and affixed my notarial seal at Peoria,
14 Illinois this 16th day of January, A.D. 2007.

15

16

17

18        _Donna M. Hagemeyer_
            CSR-RPR-CP

19

20

21

22

23



"OFFICIAL SEAL"
DONNA M HAGEMEYER
COMMISSION EXPIRES 12/01/10